Docket No. 104095.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. PAMELA SLATER, Appellee.

*Opinion filed March 20, 2008.*

JUSTICE FREEMAN delivered the judgment of the court, with opinion.

Chief Justice Thomas and Justices Fitzgerald, Kilbride, Garman, Karmeier, and Burke concurred in the judgment and opinion.

## OPINION

Following a bench trial in the circuit court of Will County, defendant, Pamela Slater, was convicted of one count of permitting the sexual abuse of a child (720 ILCS 150/5.1 (West 2002)) and was sentenced to four years' incarceration. The appellate court reversed defendant's conviction and remanded the cause for a new trial. No. 3–04–0640 (unpublished order under Supreme Court Rule 23). We granted the State's petition for leave to appeal (210 Ill. 2d R. 315), and, for the reasons that follow, we reverse the judgment of the appellate court.

BACKGROUND

Defendant was charged with predatory criminal sexual assault of a child (720 ILCS 5/12–14.1(a)(1) (West 2002)) and with permitting the sexual abuse of a child (720 ILCS 150/5.1 (West 2002)). The State alleged that the child victim in this case was defendant's 11-year-old daughter, K.S. Among the several pretrial motions filed by defendant was a motion to determine her fitness to stand trial. The court-appointed psychologist, Dr. Randi Zoot, found defendant to be "alert, oriented to person, place date and situation, and cooperative," and that she had a verbal IQ of 81, a performance IQ of 70, and a full-scale IQ of 74. Although defendant's "overall I.Q. places her in the borderline range of intellectual functioning and her verbal abilities are low average," Dr. Zoot concluded that defendant did "not suffer from a mental disorder that interferes with her ability to understand the court proceedings, the role of the court participants or from cooperating with her attorney in her defense." The parties stipulated that Dr. Zoot found defendant fit to stand trial.

Defendant also moved to suppress oral and videotaped inculpatory statements made by her on July 17, 2003, at the Will County Child Advocacy Center (Center) and at the Criminal Investigations Office at the Will County sheriff's department (sheriff's department). Defendant alleged that the statement made at the Center occurred while she was in custody and without her receiving warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). In addition, defendant alleged that the statements were involuntary because she is intellectually limited and they were made after she was threatened with the loss of her children. Defendant further alleged that the subsequent statement given by her at the sheriff's department was a direct product of the unlawful statement obtained at the Center, that the taint could not be removed, and, therefore, that this statement was inadmissible as well. Defendant therefore requested that the court suppress all inculpatory statements made by her on July 17, 2003.

At the ensuing suppression hearing, the evidence revealed that authorities became aware that K.S. had possibly been subjected to sexual abuse through a tip called into the DCFS hotline by defendant's friend. DCFS investigator Maurice Johnson followed up on this allegation by speaking to the tipster, who stated that a man named

Brian Deck was living with defendant's family, and that he and K.S. were engaged in a sexual relationship. Johnson performed a criminal background check on defendant and her husband and found that they had no criminal history; however, he did discover that at least three other prior reports had been made to DCFS about the family, and defendant's children had been removed. Johnson then visited defendant's home, where he spoke to her, her husband and K.S. Defendant and her husband were told by Johnson that Deck had to leave the premises and could not return or have any contact with K.S. until DCFS determined that it was safe for him to do so. Defendant agreed and signed a written safety plan, which allowed K.S. to remain in the home pending the outcome of the investigation.

The testimony at the suppression hearing revealed that once a report of abuse is received, it is standard procedure to arrange a "victim sensitive interview" (VSI) of the minor at the Center. The Center makes the arrangements for the interview, and before the interview can take place, a parent must grant permission to speak with the child. The VSI for K.S. took place on July 17, 2003, and defendant and her daughter arrived at the Center at 1 p.m. They were driven to that location by Deck, who planned to wait in the car until he was called to pick them up at the completion of the interview. According to protocol, defendant was interviewed by Mary Jane Pluth, a Center social worker, to obtain permission to speak with K.S. Defendant gave her consent and, in the course of doing so, denied that any abuse had occurred. Pluth then separately interviewed K.S., who also denied that any abuse had taken place.

The State presented the testimony of Detective John Ruettiger, a member of the Will County sheriff's department, who stated that he and his partner, Detective Richard Ackerson, were present at the Center at the time defendant and her daughter arrived. The sheriff's department had received a report from DCFS alleging that K.S. was the victim of sexual abuse, opened a criminal investigation file, and assigned him and his partner to attend the VSI. Ruettiger stated that at that time defendant "was not the focus of our investigation," and that it was not unusual that DCFS investigator Johnson and Will County Assistant State's Attorney Heidi Brink were also present at the Center.

-3-

After Pluth spoke with defendant and K.S., Reuttiger stated that he, Ackerson, Pluth, Johnson and Brink met to discuss the interviews, and concluded that both defendant and K.S. were being untruthful. Ruettiger decided that he and Ackerson would speak further with K.S, and informed defendant that they were doing so because "we didn't believe that [K.S.] was being completely honest with us." Ruettiger stated that he spoke to defendant in a small meeting room at the Center, which contained a desk and a few chairs. DCFS investigator Johnson was already in the room with defendant when he and Ackerson entered, and the detectives then left defendant in the room with Johnson to speak with K.S.

Ruettiger then questioned K.S., and she admitted that she and Deck were having sexual intercourse. K.S. stated that Deck was a family friend who was in his thirties and who had lived on and off at her family's home for several months. After K.S. made this admission, Ruettiger and Ackerson returned to speak with defendant, who was still in the interview room with Johnson. Ruettiger stated that the purpose of this second interview with defendant was twofold: to inform defendant of what K.S. had just told them and to find out if defendant knew that K.S. and Deck were having sex in her home. Ruettiger denied that the purpose of this discussion was to gain a confession from defendant; rather, he stated that he intended to do some "fact finding" with respect to the admission made by K.S.

Ruettiger testified that this second interview with defendant lasted between 10 and 15 minutes. Defendant was not given *Miranda* warnings, and she was not handcuffed during their conversation. Both Ruettiger and Ackerson were in plain clothes and had weapons that were holstered. When Ruettiger asked defendant if she knew that her daughter and Deck were having sex, defendant "began to break down and cry," and she started to talk. Defendant acknowledged that sexual contact had occurred between Deck and her daughter, and Ruettiger stated that at that moment the focus of the investigation changed: "[I]t became very clear to us that she knew exactly what was going on with her child and this adult male, and, at that point *** the investigation began to broaden some." During their questioning of defendant, the door to the interview room was closed, but not locked. It was not Ruettiger's intent to close the door to keep defendant from leaving; rather, it was for privacy due to the sensitive nature of the discussions.

Ruettiger stated that he and defendant had no trouble understanding each other during their interaction, and that defendant never told him that she wished to leave.

Ruettiger testified that he "stopped speaking to [defendant]" when she began to tell them in detail what had been going on in her home between K.S. and Deck. Ruetigger then stepped out of the room and advised Assistant State's Attorney Brink of what had occurred. Brink told him to transport defendant to the sheriff's department to give her *Miranda* warnings and to take a formal statement from her. Ruettiger testified that defendant was not taken into custody at the Center.

Ruettiger then asked defendant if "she would come with us to the criminal investigation offices to talk about further what we had talked about at the Advocacy Center," and defendant agreed. Defendant never asked if she had to go, and they did not tell her that she did not have to accompany them. Ruettiger and Ackerson then escorted defendant to the sheriff's department, which was a five-minute walk from the Center. During the walk, defendant was not handcuffed and no weapons were drawn.

Ruettiger stated that they arrived at the sheriff's department at approximately 4 to 4:15 p.m., and defendant was placed in an interview room. Shortly thereafter he and Detective Ackerson went in to speak with her; she was not handcuffed and their weapons were not drawn. Prior to the start of questioning, Ruettiger read defendant her *Miranda* rights from a preprinted form. At approximately 4:45 p.m. defendant signed the form, indicating that she had received the rights, understood them and waived them. Defendant never indicated to the officers that she did not understand her rights, nor did she question what was contained in the form. He and Ackerson then told defendant that they wanted to speak to her in more detail about the relationship between K.S. and Deck. Defendant made an oral inculpatory statement, and Ruettiger asked if she would allow her confession to be videotaped. Defendant agreed, and they began the videotaped statement at approximately 5:30 p.m. Ruettiger testified that he did not know that defendant and her husband were receiving services for developmentally disabled persons until defendant mentioned it during the taped interview.

-5-

The State also called Detective Richard Ackerson to testify at the suppression hearing, and he largely corroborated the testimony of his partner, Ruettiger. Ackerson additionally testified that at the time of the second interview of defendant at the Center, the door to the room they were in was open at first, but when defendant became upset, began to cry, and became loud, they decided to shut the door so as not to disturb others at the Center. In addition, Ackerson testified that when they interviewed defendant at the sheriff's department, the door to the room was closed. Further, Ackerson testified that defendant was informed that she was under arrest after that interview was completed and the videotaped statement was concluded.

The State then played the videotaped statement of defendant made at the sheriff's department, which corroborated the prior testimony of Reuttiger and Ackerson. The recording began at 5:30 p.m. and showed defendant sitting in a room at a table being primarily questioned by Ruettiger, with Ackerson sitting off to the side. Defendant stated that Deck had been dating her friend, and that defendant and her husband let the couple live in their home. In defendant's words, Deck became "fascinated" with K.S., bought her expensive gifts, and started to sleep in the same bed as K.S. Defendant freely offered information to the officers, spoke in great detail about her knowledge of the relationship between Deck and her daughter, and related various specific incidents where they were "acting like boyfriend and girlfriend." She was only occasionally prompted by the officers with questions; for the most part, defendant controlled the conversation and the topics. At one point, defendant told the officers that Deck "is a controlling person. He takes advantage of people that are mentally handicapped and mentally ill like me and my husband, and anybody else that is that way." Defendant also volunteered that Deck provided money to the family for their expenses, that he had planned to celebrate K.S.'s twelfth birthday by taking K.S. and her 12-year-old friend to a hotel, and that this incident drove her to now tell the truth because she no longer wanted Deck with her daughter and she hoped to prevent him from victimizing other young girls, such as K.S.'s friend. Defendant acknowledged that when Ruettiger and Ackerson first brought her to the sheriff's department, they gave her *Miranda* rights and she understood those rights. Ruettiger then showed defendant a form and she stated that she signed the form and waived

her rights. The recorded statement concluded at 5:54 p.m. The State then rested its case.

Defendant called Maurice Johnson to testify on her behalf. He stated that it is common practice after a VSI to meet with the minor's parents and inform them of the likely next steps, and that this was his purpose of speaking with defendant: "I told [defendant] that based upon what I observed in the interview she was not being truthful. I indicated to her that the investigation would continue and that there was a possibility that the children were at risk of being removed from her care." Johnson testified that if he continued to believe that defendant was not telling the truth about the situation between K.S. and Deck, he had the power to remove K.S. from the home if he thought it was in the best interests of the child. At one point, Johnson stated he was alone in the room with defendant, and after he told her that she needed to "think about her daughter and she need[ed] to protect her," defendant "tells me that she will tell the truth, and she goes on to relate that *** she believed there was a sexual relationship between [Deck] and [K.S.] based upon what she had observed." After defendant made this admission, Johnson left the room and asked the detectives to come back in. Defendant then again admitted her knowledge of the sexual relationship between Deck and K.S. Johnson could not recall if the door to the interview room was open or closed during this session.

At this point, Johnson's timeline of the interviews differs from that provided by Detectives Ruettiger and Ackerson. Johnson stated that this discussion with defendant occurred prior to the second VSI of K.S., whereas the detectives stated that it took place after K.S.'s second VSI. According to Johnson, during her second VSI K.S. admitted that she had a sexual relationship with Deck, and thereafter defendant was interviewed for a third time "to see if she would give clarification" to what K.S. had revealed. Again, this testimony differs from that of the detectives, who stated that there were two interviews of defendant at the Center, and not three. Johnson could not recall if defendant said anything at that time about being intellectually challenged or developmentally disabled. Johnson testified that he believed that defendant was arrested at the Center, but also stated that he could not recall if the detectives ever told defendant she was under arrest while there. Johnson stated that he then took K.S. into

protective custody, and that DCFS subsequently placed defendant's other children into protective custody as well.

At the close of the suppression hearing, the trial court ruled as follows. The court found that there were three separate interrogations of defendant, with the initial questioning occurring when she first arrived at the Center and was interviewed by Pluth. The court determined that no *Miranda* warnings were required for this session. The court then found that the second interrogation also occurred at the Center, when defendant was questioned by the detectives and Johnson. The court held that defendant should have been given *Miranda* warnings and suppressed the inculpatory statements made by defendant during that session. The trial court found that the third interrogation occurred at the sheriff's department. The court held that defendant was properly *Mirandized,* that her statement was voluntarily made, and that there were sufficient intervening circumstances to eliminate the taint from the invalid questioning at the Center. The trial court therefore found that defendant's statement at the sheriff's department was admissible.

At defendant's bench trial, K.S. testified that the sexual abuse occurred as set forth during the earlier suppression hearing. Johnson and Ruettiger also testified at trial, and their testimony largely mirrored that which they previously gave during the suppression hearing. The parties also stipulated as to what the testimony of Ackerson would be at trial, based upon his prior testimony at the earlier suppression hearing. Finally, the videotaped statement made by defendant on July 17, 2003 at the sheriff's department was also admitted into evidence.

The trial court found defendant guilty of the offense of permitting the sexual abuse of a child (720 ILCS 150/5.1 (West 2002)). Defendant was acquitted, however, of the charge of predatory criminal sexual assault (720 ILCS 5/12–14.1(a)(1) (West 2002)). Thereafter, defendant filed a motion for a new trial, alleging, *inter alia*, that the trial court erred in denying defendant's motion to suppress her inculpatory statements of July 17, 2003. The court denied defendant's motion, and sentenced defendant to four years' incarceration.

In an unpublished order under Rule 23, the appellate court reversed defendant's conviction and remanded this cause for a new

trial. The appellate court determined that defendant was in "custody" at the time that she made her inculpatory statement at the Center and that she should have been given *Miranda* warnings at that time. In addition, the court found that this statement was also involuntary, as defendant's will was overborne by investigators who knew of her developmental disability and coerced her to confess. The appellate court further held that because there were insufficient intervening circumstances to remove the taint of defendant's first confession at the Center from her subsequent statements at the sheriff's department, the latter inculpatory statement should not have been admitted at trial. No. 3–04–0640 (unpublished order under Supreme Court Rule 23).

Additional facts, as necessary, will be considered in connection with the issues presented.


ANALYSIS

The State contends that the appellate court erred in reversing defendant's conviction and remanding this cause for a new trial wherein the inculpatory statements made by defendant are to be suppressed. According to the State, the appellate court incorrectly held that defendant's second confession at the sheriff's department should not have been admitted at trial because it was tainted by her earlier inculpatory statement at the Center. Defendant argues that this court should affirm the judgment of the appellate court, in that it correctly held that the inculpatory statement given by defendant at the Center was invalid in that it violated *Miranda* and was involuntary, and it tainted defendant's subsequent confession at the sheriff's department. We disagree with defendant.

In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence. *In re Christopher K.*, 217 Ill. 2d 348, 373 (2005); *People v. Braggs*, 209 Ill. 2d 492, 505 (2003). We review *de novo*, however, the ultimate question posed by the legal challenge to the trial court's ruling on a suppression motion. *People v. Nicholas*, 218 Ill. 2d 104, 116 (2005). Further, it is proper for us to consider the testimony adduced at trial, as well as at the suppression hearing. *People v.*

*Melock*, 149 Ill. 2d 423, 433 (1992). Where a defendant challenges the admissibility of a confession through a motion to suppress, the State bears the burden of proving the confession was voluntary by a preponderance of the evidence. 725 ILCS 5/114–11(d) (West 2002); *Braggs*, 209 Ill. 2d at 505.

In *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966), the United States Supreme Court held that, prior to the start of an interrogation, a person being questioned by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," as long as that person has been "taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 16 L. Ed. 2d at 706-07, 86 S. Ct. at 1612; see also *Melock*, 149 Ill. 2d at 439. The finding of custody is essential, as the preinterrogation warnings required by *Miranda* are intended to assure that any inculpatory statement made by a defendant is not simply the product of " 'the compulsion inherent in custodial surroundings.' " *Yarborough v. Alvarado*, 541 U.S. 652, 661, 158 L. Ed. 2d 938, 949, 124 S. Ct. 2140, 2147 (1994), quoting *Miranda*, 384 U.S. at 458, 16 L. Ed. 2d at 714, 86 S. Ct. at 1619.

The determination of whether a defendant is "in custody," and, therefore, whether the warnings set forth in *Miranda* are required, involves " '[t]wo discrete inquiries ***: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave.' " *Braggs*, 209 Ill. 2d at 505-06, quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394, 116 S. Ct. 457, 465 (1995). When examining the circumstances of interrogation, this court has found a number of factors to be relevant in determining whether a statement was made in a custodial setting, including: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup

-10-

of the accused. See, *e.g.*, *Braggs*, 209 Ill. 2d at 506; *Melock*, 149 Ill. 2d at 440. After examining and weighing these various factors, we then must make an objective determination as to whether, under the facts presented, "a reasonable person, innocent of any crime" would have believed that he or she could terminate the encounter and was free to leave. *Braggs*, 209 Ill. 2d at 506; *People v. Fair*, 159 Ill. 2d 51, 66-67 (1994).

As a preliminary matter, we note that the trial court found that defendant was questioned on three occasions on July 17, 2003: she was questioned twice at the Center–when she initially arrived at that location and was interviewed by Pluth, and thereafter when she was questioned by Reuttiger, Ackerson and Johnson after K.S. admitted that she had engaged in sex with Deck–and later that afternoon at the sheriff's department. As stated, findings of fact made by a trial court on a suppression motion are accorded deference because that court is in the best position to observe the conduct and demeanor of the parties and witnesses, to assess their credibility, and to give the appropriate weight to the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). Based upon our review of the record, we hold that the trial court's finding that defendant was questioned in two separate sessions at the Center and thereafter at the sheriff's department is not against the manifest weight of the evidence.

Having found that defendant was subject to three questioning sessions on July 17, 2003, the trial court then framed its analysis and holdings as follows:

> "The initial questioning of [defendant] occurs when she brings her daughter in for, basically, a VSI *** [a]nd [defendant] is questioned in a very, I guess not an abnormal fashion where a parent brings in a child, that there is information that that child is potentially a victim of abuse. *** [At that time defendant] at least is suspected of enabling some type of abuse. But I think that at that initial stage, that questioning is not at all the type that needs Miranda to apply.
>
> However, then there is a subsequent, a second, interview at the Advocacy Center where it's pretty clear that [defendant] is considered a suspect. She has been–the information she is providing has already been investigated and somewhat invalidated. And the second time she is questioned at the

Advocacy Center, it's clear to me that she is a suspect in this action. And it's also pretty clear to me that she at that point should have been Mirandized before the questioning proceeded.

So, I think that, clearly, the second interview at the Advocacy Center, the defendant is the focus. I suppose at that point you could argue that she could have walked out. She could have been free to leave. But I do think that it would have been much more obvious to her had they followed [Miranda] and given her her Miranda rights so she would have been aware of the consequences of her admissions.

So with regard to that second interview, I believe Miranda should have been given. I have to follow the Supreme Court's decisions and suppress those statements that are made.

Now, we get down to, really, what I call the third interaction where [defendant] has been taken to [the sheriff's department]. She is Mirandized, and she gives further incriminating statements. *** I think at that point the officers have taken all the steps necessary to protect her rights.

\* \* \*

The in custody, the true in custody investigation [at the sheriff's department] creates some additional issues. There, clearly, Miranda was given. And I suppose there is a question of whether there was a sufficient intervening of circumstances that would validate the supplemental questioning and the videotaped statement that was given. Clearly, at this point [defendant] is cooperating, is giving what appears to be a free and voluntary statement.

I know there is [*sic*] issues regarding her mental state, her I.Q., her ability to fully understand, but I am not convinced that the statements made to the officers at the [sheriff's department] was [*sic*] involuntary. *** I am going to allow the questioning within the [sheriff's department], and I am going to bar the prior questioning of [defendant]."

It is readily apparent from a review of the trial court's ruling that it failed to specifically resolve the threshold legal issue of whether defendant was "in custody" during either of the questioning sessions

at the Center. Despite not having answered the critical question which determines whether *Miranda* warnings must be given under a certain set of facts, the trial court nevertheless concluded that *Miranda* warnings were unnecessary for the first questioning session at the Center, but were necessary for the second interrogation. In both instances, the trial court misdirected its analysis and pegged its *Miranda* holdings upon what it perceived were the varying levels of suspicion the officers harbored with respect to defendant's guilt. The United States Supreme Court has made it clear that "a police officer's subjective view that the individual under questioning is a suspect, if undisclosed, does not bear upon the question whether the individual is in custody for purposes of *Miranda*." *Stansbury v. California*, 511 U.S. 318, 324, 128 L. Ed. 2d 293, 299, 114 S. Ct. 1526, 1529-30 (1994). In *Stansbury*, the Court reasoned that as long as the officer's beliefs with respect to an individual's guilt are not revealed to that person, it does "not affect the objective circumstances of an interrogation or interview, and thus cannot affect the *Miranda* custody inquiry." *Stansbury*, 511 U.S. at 324, 128 L. Ed. 2d at 300, 114 S. Ct. at 1530. If, however, an officer's beliefs of a person's guilt "are conveyed, by word or deed, to the individual being questioned," such beliefs "may bear upon the custody issue." *Stansbury*, 511 U.S. at 325, 128 L. Ed. 2d at 300, 114 S. Ct. at 1530. In turn, such disclosed beliefs "are relevant only to the extent they would affect how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her ' "freedom of action." ' " *Stansbury*, 511 U.S. at 325, 128 L. Ed. 2d at 300, 114 S. Ct. at 1530; see also *Braggs*, 209 Ill. 2d at 506-07. We note, however, that even under such circumstances, this would be "one among many factors that bear upon the assessment whether that individual was in custody," and not the sole determinant of that issue. *Stansbury*, 511 U.S. at 325, 128 L. Ed. 2d at 300, 114 S. Ct. at 1530.

There is no evidence before us that any suspicions that the investigators may have had with respect to defendant's potential culpability were ever communicated to her, and, in fact, defendant makes no such argument. Further, the trial court made no factual finding that the officers conveyed in any manner a belief to defendant that she was guilty or how this knowledge would affect a reasonable person in defendant's position with respect to her perception that she

was free to leave. Accordingly, the trial court erred by basing its ruling that *Miranda* warnings were required prior to defendant's second statement at the Center solely upon what it believed to be the officers' focus upon defendant as a suspect. Because the trial court failed to employ the proper analytical framework and to consider the factors relevant to assessing whether defendant was subject to custodial interrogation, we address this issue in the first instance and examine the relevant factors.

As stated, one factor considered in making a custody determination is the manner by which the individual arrived at the place of questioning. It is undisputed that defendant made her own way to the Center, as she was driven there by Deck, who was also waiting to pick her and K.S. up and take them home after the VSI. Defendant's voluntary arrival at the Center by means of her own transportation is distinguishable from a situation in which a defendant is transported to and from the place of interrogation by law enforcement officers and has no other means of egress from that location. *Cf. Braggs*, 209 Ill. 2d at 511-14 (defendant found "in custody" for *Miranda* purposes where officers transported her to and from multiple interrogations).

We also look to the location, time, length, mood, and mode of the questioning, as well as the number of police officers present. We first examine the initial questioning session at the Center. The testimony was uncontroverted that it was standard procedure for a parent to be interviewed by someone from the Center prior to a VSI of the child in order to gain permission for the child's interview, and that this was the purpose of Pluth's discussion with defendant. The evidence showed that this was a very short encounter of a few minutes duration, that the discussion was only between defendant and Pluth, and that defendant granted Pluth permission to interview K.S. and, in the course of doing so, denied that any abuse had taken place. No police officers were present during this initial questioning session.

Analyzing these same specific factors in terms of the second interview of defendant at the Center, we note that it took place in an interview room which contained a table and chairs. The testimony was uncontroverted that this session lasted for the short duration of only between 10 to 15 minutes. *Cf. People v. Townes*, 91 Ill. 2d 32, 36 (1982) (factors supporting defendant was in custody included his

interrogation over a 12-hour period). Although the testimony was not entirely clear as to whether and when the door of the room was opened or closed, it appears that it was closed at the time that defendant began to cry and become upset and loud as a means to ensure not only the privacy of the sensitive discussions but also that others at the Center were not disturbed. There was no indication that the door was ever locked.

The evidence was also uncontroverted that this session with defendant was intended to both apprise her of the fact that her 11-year-old daughter had just admitted she was having sex with Deck in defendant's home, and also, in the words of Reuttiger, to help the investigators do some "fact finding" with respect to K.S.'s admission so that they could ensure her safety. In addition, it is undisputed that Johnson informed defendant that, because he could not believe her denials that K.S. had not been abused, he could remove K.S. from defendant's care if he thought there was a danger to the minor and if that was in the best interests of the child. There is nothing in the record to indicate that defendant was ever threatened that her children would be removed from her care *as a result of* her failure to confess; defendant was simply apprised of the next steps that would be taken to ensure her child's safety. Further, the record is devoid of anything to indicate that the investigators harassed defendant or raised their voices. It is also undisputed that when defendant began to reveal her knowledge of the relationship between K.S. and Deck, the questioning immediately ceased. It is likewise uncontroverted that during this short session, defendant was interviewed alternately by Johnson alone, and at some point the two detectives also joined him; however, all three men were not in the room with defendant during the duration of the questioning.

Although defendant points to the fact that a number of investigators and law enforcement personnel were at the Center for K.S.'s VSI, there is no evidence that they converged on defendant as a group. To the contrary, the record reflects that defendant interacted with different individuals at different times for different purposes, with the exception of Assistant State's Attorney Brink, who appears to have had no personal contact with defendant while she was at the Center. We also find it significant that defendant was interacting with these individuals at the Center and not at a police station, which

-15-

would likely present a more foreboding, intimidating and adversarial environment.

We also note that there were no indicia of formal arrest procedures during defendant's questioning at the Center. The record is devoid of any use of a show of force or weapons, physical restraint, booking, or fingerprinting. *Cf. People v. Brown*, 136 Ill. 2d 116, 127-28 (1990) (factors supporting defendant was in custody included that police officers searched and handcuffed defendant, took him to the police station, and filled out an arrest card). Throughout the time defendant was at the Center, the detectives were in plain clothes and not uniformed, although they did carry holstered weapons. We also note that although defendant was not advised that she was free to leave, she also at no time requested to leave.

In making a custody determination for purposes of *Miranda*, we also look to the age, intelligence, and mental makeup of the accused. The record reflects that defendant is a middle-aged adult who took special education classes and graduated from high school, and who can read well enough to enjoy a novel. Defendant has no criminal history and no acknowledged contact with the criminal justice system, although the evidence reveals that she has dealt with DCFS in the past. Defendant underwent a fitness evaluation prior to trial, and although Dr. Zoot concluded that defendant's full-range IQ of 74 places her in the "borderline range of intellectual functioning," it was uncontradicted and stipulated that defendant was fit to stand trial because she possessed the ability to understand court proceedings and legal concepts. *Cf. Braggs*, 209 Ill. 2d at 511-13 (factors supporting defendant's interrogation was custodial included fact that she had an IQ of 54, could not readily understand her circumstances, and had been found unfit to stand trial). Although there was testimony that defendant and her husband were receiving services through an agency for the developmentally disabled, it is unclear whether those services were primarily directed towards defendant, or whether she was a recipient of such services as a result of her marriage to her husband.[1] Further, the testimony is undisputed that defendant did not have

---

[1]Johnson testified that upon visiting defendant's home, he could visibly see that her husband had "very low" intellectual capabilities.

difficulty in communicating with anyone at the Center, and that there was no outward indication whatsoever that she is developmentally disabled. We also note that during the videotaped confession taken from defendant later in the day at the sheriff's department, defendant speaks very fluently with the officers, engages them in conversation, and has no apparent communication difficulties. *Cf. Braggs*, 209 Ill. 2d at 511-13 (factors supporting that the mentally retarded defendant was in custody included fact that police communicated with her through her guardian/sister, as defendant was unable to communicate directly with officers).

Our review of the above factors leads to the conclusion that, based upon the circumstances presented, a reasonable innocent person in defendant's position would have felt free to terminate her encounter and leave the Center if she so desired. With respect to the first questioning session between Pluth and defendant, there is nothing in the record to indicate that this was anything other than a routine discussion between a member of the Center and a parent who was requested to give her permission to allow her child to take part in a VSI based upon information that the child was potentially a victim of abuse. Accordingly, there is no indication that defendant was in custody at the time this interaction took place.

With respect to the second questioning session defendant underwent at the Center, during which she gave an inculpatory statement, we note that the trial court, while not specifically ruling on whether defendant was in custody during this questioning, did state that "you could argue that she could have walked out. She could have been free to leave." We also observe that in its ruling the trial court contrasted the circumstances of the questioning at the Center with the subsequent questioning of defendant at the sheriff's department and characterized the latter interrogation as the "in custody, the true in custody investigation." These comments strongly suggest that the trial court was not convinced that defendant was subject to a custodial interrogation at the Center.

The appellate court, however, arrived at a contrary conclusion, holding that defendant was in custody during her second interrogation at the Center, and therefore *Miranda* warnings were required. We observe that the entire extent of the analysis of the appellate court with respect to the question of whether defendant was in custody is

comprised of two sentences. The appellate court neither discussed the factors pertinent in making a determination as to whether a defendant is subject to a custodial interrogation nor employed the appropriate analytical framework in arriving at its decision.

Based upon our review of the record, we reject the conclusion of the appellate court and hold that with respect to the second questioning session at the Center, a reasonable innocent person, faced with the circumstances in which defendant found herself, would have felt at liberty to terminate the questioning and leave. In sum, we hold that the circumstances surrounding the second questioning session at the Center were noncustodial, as no innocent person would have believed that her freedom was restrained. Since defendant was not in custody, *Miranda* warnings were not necessary.

Having determined that the inculpatory statement made by defendant during the second questioning session at the Center did not violate *Miranda*, we address defendant's argument that notwithstanding the lack of *Miranda* warnings, her statement was nevertheless invalid, as it was involuntary. We note that defendant's argument echoes the appellate court's concerns about the voluntariness of this statement. We also observe that because the trial court suppressed this inculpatory statement based upon its belief that defendant was not properly *Mirandized*, it was unnecessary for that court to engage in an analysis of whether defendant's statement was also voluntary.

Even where *Miranda* warnings are not required, the fifth amendment still demands that a defendant's confession be voluntary. *Beckwith v. United States*, 425 U.S. 341, 347-48, 48 L. Ed. 2d 1, 8, 96 S. Ct. 1612, 1617 (1976); *Melock*, 149 Ill. 2d at 452. The test for voluntariness is "whether the defendant made the statement freely, voluntarily, and without compulsion or inducement of any sort, or whether the defendant's will was overcome at the time he or she confessed." *People v. Gilliam*, 172 Ill. 2d 484, 500 (1996). In making this determination, we consider the totality of the circumstances surrounding the statement, including: (1) the defendant's age, intelligence, education, experience, and physical condition at the time of the detention and interrogation; (2) the duration of the interrogation; (3) the presence of *Miranda* warnings; (4) the presence of any physical or mental abuse; and (5) the legality and duration of

-18-

the detention. See, *e.g.*, *People v. Willis*, 215 Ill. 2d 517, 536 (2005); *Gilliam*, 172 Ill. 2d at 500-01. The State bears the burden of proving, by a preponderance of the evidence, that the confession was voluntary. 725 ILCS 5/114–11(d) (West 2002); *In re G.O.*, 191 Ill. 2d 37, 49 (2000).

We first consider defendant's age, intelligence, background, experience, mental capacity, education, and physical condition at the time of questioning. As discussed earlier in this opinion, the evidence is uncontroverted that defendant's intellectual limitations were not outwardly apparent to the detectives and did not interfere with her ability to communicate with them. This is confirmed by our own review of defendant's subsequent videotaped statement, wherein she speaks fluently with the officers in a conversational manner, engages–and often leads–the officers in conversation, freely offers details, and is very open and cooperative. There are no outward indications from our viewing of this recorded statement that defendant has a disability. *Cf. Braggs*, 209 Ill. 2d at 516 (factors supporting that defendant's confession was involuntary included her inability to communicate with police, and the officer's awareness of her severe disability). Although defendant's IQ was characterized as "borderline" by Dr. Zoot, it is uncontroverted and stipulated that defendant was fit to stand trial. *Cf Braggs*, 209 Ill. 2d at 517 (defendant's unfitness to stand trial due to mental retardation a factor in finding confession involuntary). Our conclusion is further supported by the trial court's finding that defendant's intellectual limitations did not render her subsequent confession at the sheriff's department involuntary, which suggests that the trial court implicitly found that defendant's disability was not so severe as to render her incapable of making a voluntary confession.

In examining the legality and duration of the detention and questioning, as we noted above, it is uncontroverted that defendant arrived at the Center of her own free will and not by police transport. Further, it is undisputed that the questioning session during which defendant gave her inculpatory statement was of short duration–15 minutes or less–and that it was aimed primarily at apprising defendant in her role as a parent of K.S.'s statement that she had been abused and in assuring the safety of the minor. During this short session, defendant was alternatively questioned by Johnson alone and, for

some period, Reuttiger and Ackerson also were in the room. However, all three were not in the room for the entire questioning session. Again, we also note that this questioning occurred in an interview room at the Center and not in a police station.

We also find that defendant was not the subject of any physical or mental abuse by her questioners, including the existence of threats or promises. The evidence is uncontroverted that defendant was told that her statements that K.S. had not suffered abuse were not believed, and that it was possible that K.S. would be removed from defendant's care if it was in the best interests of the minor to ensure her safety. However, the record is devoid of any threat that defendant's children would be removed *because* she failed to confess. In addition, the fact that defendant first denied the abuse and then changed her statement indicated that she understood the situation and wished to avoid the consequences of her permitting her daughter to be further abused by Deck. In fact, during her subsequent videotaped statement, defendant candidly admitted that she was telling the truth about what happened between K.S. and Deck because she not only wanted to keep her daughter away from him, but also wanted to prevent him from victimizing other young girls, such as her daughter's friend. Finally, we note that although defendant was not told that she could leave the Center, she never indicated a desire to terminate the questioning and leave the premises.

We have examined the particular circumstances surrounding defendant's questioning, as well as her relevant personal characteristics, and conclude that she was not induced to make an involuntary inculpatory statement. We hold that the inculpatory statement made by defendant during the second questioning session at the Center was voluntary and not the product of police coercion. Accordingly, the appellate court erred in holding that the inculpatory statement made by defendant at the Center was involuntary and therefore inadmissible.

Because we hold that the inculpatory statement made by defendant during the second questioning session at the Center did not violate *Miranda* and was made knowingly and voluntarily, it was properly admissible at trial. Therefore, the second inculpatory statement made by defendant thereafter at the sheriff's department could not be tainted by the properly obtained first statement. The validity of the confession

made by defendant at the sheriff's department has not been questioned absent its relationship to the earlier inculpatory statement provided by defendant at the Center. Because we hold that the first confession at the Center was valid, the appellate court erred by holding that the second confession at the sheriff's department was tainted.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed, and the judgment of the circuit court of Will County is affirmed.

*Appellate court judgment reversed;*
*circuit court judgment affirmed.*