**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 180426-U

Order filed April 11, 2022

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 12th Judicial Circuit, Will County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0426 Circuit No. 15-CF-374 |
| DAVID B. LIBBY, | ) ) ) | Honorable Sarah-Marie Jones, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE LYTTON delivered the judgment of the court.
Presiding Justice O'Brien and Justice Schmidt concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: (1) The circuit court did not err in denying defendant's motion to suppress a recording of his police interview where he admitted to sexually abusing his daughters; (2) the court did not err in denying defendant's motion for a mistrial when a detective cried on the witness stand; and (3) defendant's 12 consecutive natural life sentences are proper.

¶ 2     Defendant, David B. Libby, appeals his conviction for 12 counts of predatory criminal

sexual assault of a child. Defendant argues that the Will County circuit court erred in denying his

motion to suppress and motion for a mistrial. He further argues that instead of 12 consecutive natural life sentences, he should only be sentenced to one natural life term. We affirm.

¶ 3                                                      I. BACKGROUND

¶ 4          Defendant was charged by indictment with 12 counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014)). The indictments alleged that defendant committed various sexual acts against his daughters, A.L. and K.L., between October 2004 and September 2014.

¶ 5          Prior to trial, defendant filed a motion to suppress the statements he made during an interview with the police prior to his arrest. Defendant argued he was not afforded an opportunity to waive his constitutional rights during the interview, because the detectives did not provide him with his *Miranda* rights before interrogating him. The circuit court held a hearing on the motion to suppress on April 22 and 27, 2016.

¶ 6          The testimony at the hearing established that Detectives Dino Dabezic and Jeffrey Cook interviewed defendant on February 18, 2015. Cook testified that he arranged with defendant's wife, Allene Libby, to interview defendant at the Plainfield Police Department regarding allegations A.L. and K.L. made at school and at victim sensitive interviews at the Children's Advocacy Center (CAC) that were conducted on February 17, 2015. The initial purpose of the interview was to gain background information about the family and to provide defendant with details about the allegations made against him. Dabezic and Cook conducted the interview with defendant while Allene remained in the lobby. Defendant did not bring an attorney to the interview. Dabezic and Cook both testified that defendant was alert during the interview and did not seem to have trouble understanding their questions or the meaning of the *Miranda* warnings when Dabezic recited them to him.

¶ 7 Defendant testified that he had never been interviewed by police before and that he did not feel free to leave. He also testified that he had been awake for two days straight due to work and stress, and that his exhaustion clouded his thinking. He argued that he only made the admissions because the officers did not believe him when he denied the allegations and that he wanted to end the questioning. Defendant testified that he did not fully understand what his *Miranda* rights were when they were recited to him, because he was unfamiliar with the law and only knew what they were because of television shows.

¶ 8 At the hearing, the State presented a video recording of defendant's interview to the court, and the court took the matter under advisement so it could review the video before making its ruling. The contents of the video showed that at the start of the interview Dabezic told defendant he could leave the interview at any time. Defendant told the detectives that he knew he was being interviewed because one of his daughters said he had been "mishandling" them, but he did not know the specifics of the allegations. Dabezic and Cook asked defendant first to provide background information regarding his deceased wife, who was A.L.'s and K.L.'s mother, and defendant's current household dynamics. Approximately 40 minutes into the interview, the detectives questioned defendant on the allegations made by A.L. and K.L. during the CAC interviews, that defendant sexually abused them for years. Defendant denied the allegations, and Dabezic and Cook told him that they believed A.L. and K.L. Defendant accused the detectives of looking for a reason to throw someone in jail, and they responded that they were just trying to help the family.

¶ 9 Approximately one hour into the interview, defendant admitted he sometimes masturbated in the bathroom while A.L. or K.L. was in the shower. The detectives continued to question defendant and asked him to help them understand why he would sexually assault his daughters.

3

Dabezic suggested defendant did it because one daughter looked like his deceased wife. Defendant nodded his head, began to cry, and held out his hands in what defendant later argued was an "arrest me" gesture. The detectives responded that they were just there to talk and wanted to help him. The detectives questioned defendant further, and he admitted to having had anal sexual contact with A.L. and K.L., and that he would place his penis near and sometimes in their mouths. Defendant stated the abuse would happen in the basement on the couch or the floor. The sexual contact began a couple months after defendant's wife died.

¶ 10　　　　Approximately 1 hour and 20 minutes into the interview, Dabezic exited the room to speak to a supervisor. Cook left the room approximately eight minutes after Dabezic, and both detectives returned approximately two minutes later. At that time, Dabezic read the *Miranda* warning to defendant and asked defendant to summarize what he had already told them.

¶ 11　　　　Defendant restated what he already admitted to the detectives and added that he would sexually assault A.L. and K.L. approximately once a week. He stated that he stopped a year after his wife died and he had apologized to his daughters two or three years ago. Dabezic told defendant that the timing was different from what A.L. and K.L. described, and defendant responded that the contact may have gone on for two years but not for as long as what A.L. and K.L. alleged. The detectives arrested defendant approximately three hours into the interview. At no time during the interview did defendant ask for an attorney.

¶ 12　　　　Prior to the court reaching its decision on the matter, the State was allowed to reopen proofs. Dabezic and Cook both testified regarding the "question first, warn later" technique. They denied having heard of the technique and stated that they did not use it when interviewing defendant.

¶ 13    The court ultimately found defendant's testimony at the hearing to be incredible. The court stated that defendant testified that he did not understand his *Miranda* warnings yet had heard the warnings recited on television and therefore knew what they were. The court further found that the detectives were reliable in their testimony and did not intend to circumvent the requirements of *Miranda*. The court denied the motion to suppress and found that defendant was not in custody during the interview.

¶ 14    The evidence presented at defendant's jury trial revealed that on February 9, 2015, K.L.'s math teacher found K.L. writing "I want to die" on a math test. The math teacher arranged for K.L. to speak with a social worker, and K.L. told school officials that she and A.L. had been sexually abused by their father.

¶ 15    K.L. and A.L. were removed from their home, and a CAC interview was conducted on February 17, 2015. Jaclyn Lundquist testified that she conducted the CAC interviews. Lundquist testified that K.L. told her that defendant would have sexual contact with her in the bathroom, her bedroom, and the basement whenever everyone was gone or not paying attention. K.L could not give an exact number of how many times defendant had abused her.

¶ 16    K.L. testified that defendant began sexually abusing her when she was five or six years old, which was shortly after her mother died. She was not able to estimate how many times the sexual abuse had occurred and stated that it happened whenever defendant was able to do so and when no one else was around. The abuse would occur in the bathroom, her bedroom, and basement. Defendant would place his penis in her anus or in her mouth. The abuse stopped the summer prior to middle school.

¶ 17    A.L. also testified regarding defendant's sexual abuse. Defendant sexually abused A.L. from when she was four years old until she was in fourth grade. The abuse began before her mother

5

died and would occur when her mother worked in the evenings. The abuse became more frequent after A.L.'s mother died. Defendant anally abused A.L. multiple times a week until Allene moved into the house, then it lessened to once or twice a week. The abuse mainly occurred in the bathroom or basement.

¶ 18    Cook testified regarding his interview with defendant. During his testimony, the State introduced the video recording of defendant's police interview. While the jury watched the interview, Cook turned his back to them and began to cry on the witness stand. The court noticed Cook crying and excused the jury. Defendant made a motion for mistrial due to the prejudicial effect of the investigating officer crying while watching the interview. The court observed that in the way Cook was hunched over, it seemed like he was having back pain. The court did not immediately realize what he was doing and excused the jury as soon as it became clear. Cook also had his back turned to the jury, which limited the chance that a member of the jury saw or noticed him crying. Further, both the State and defense counsel admitted that they were not aware of Cook crying until the court excused the jury. The court denied defendant's motion, finding that there was little chance the jury saw Cook cry.

¶ 19    The jury found defendant guilty of all 12 counts of predatory criminal sexual assault of a child. Defendant filed a motion for a new trial, which was denied on June 13, 2018. On July 17, 2018, the court sentenced defendant to 12 natural consecutive life sentences. Defendant appealed.

¶ 20                                II. ANALYSIS

¶ 21                             A. Motion to Suppress

¶ 22    Defendant claims that the circuit court erred when it denied his motion to suppress evidence. Defendant argues that the statements made prior to receiving his *Miranda* warnings, as well as his post-*Miranda* statements, should be suppressed because he believed he was in custody

6

during the interview. Further, the detectives employed the improper "question first, warn later" tactic to circumvent their failure to give defendant his *Miranda* warnings at the start of the interview.

¶ 23       When reviewing a circuit court's ruling on a motion to suppress, we afford great deference to the court's credibility determinations and findings of fact, and we will disturb those findings only if they are against the manifest weight of the evidence. *People v. Slater*, 228 Ill. 2d 137, 149 (2008). However, the court's ultimate ruling on whether the statement was made voluntarily is reviewed *de novo*. *People v. Murdock*, 2012 IL 112362, ¶ 29. In reaching our decision, we will consider the testimony presented at the suppression hearing and at trial. *Slater*, 228 Ill. 2d at 149. Further, once a defendant challenges the admissibility of a confession through a motion to suppress, the State then has the burden of proving the confession's voluntariness by a preponderance of the evidence. 725 ILCS 5/114-11(d) (West 2020); *Slater*, 228 Ill. 2d at 149.

¶ 24       In *Miranda v. Arizona*, 384 U.S. 436, 444 (1996), the United States Supreme Court held that before being questioned by law enforcement officers, a person must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," if that person "has been taken into custody or otherwise deprived of his freedom of action in any significant way." It is well-settled that the preinterrogation warnings required by *Miranda* are unnecessary if the individual sought to be questioned is not in custody. *Slater*, 228 Ill. 2d at 149. An individual is considered to be in custody "if, under the circumstances of the questioning, 'a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave.' " *People v. Jordan*, 2011 IL App (4th) 100629, ¶ 17 (quoting *People v. Braggs*, 209 Ill. 2d 492, 506 (2003)).

7

¶ 25    Factors relevant to the inquiry into whether an individual was in custody include: (1) the location, time, length, mood, and mode of questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused. *Slater*, 228 Ill. 2d at 150. After examining and weighing these factors, the circuit court must make an objective determination as to whether, under the facts presented, " 'a reasonable person, innocent of any crime' would have believed that he *** could terminate the encounter and was free to leave." *Id.* (quoting *Bragg*, 209 Ill. 2d at 150).

¶ 26    The detectives did not violate defendant's *Miranda* rights because he was not initially in custody when he made his pre-*Miranda* warning statement. Specifically, defendant freely and voluntarily came to the police station with his wife, who waited in another room while the interview took place. Dabezic told defendant that he was free to leave. Defendant was never placed in handcuffs, told he was under arrest when the interview began, or restrained in any way. Additionally, as noted by the court, the record established that defendant was intelligent enough to understand what was going on and to act accordingly. While the number of police officers present during the interrogation and absence of defendant's wife from the interview room militate in favor of a finding of custody, those factors are outweighed by the factors that indicate defendant was not in custody. Considering the totality of the circumstances, we find defendant was not in custody during the pre-*Miranda* warning portion of the interview, and the circuit court did not err in denying the motion to suppress.

¶ 27    Defendant further argues that his statements in his interview should be suppressed because the detectives improperly administered the "question first, warn later" strategy and that his postwarning statements should also be suppressed. Under this technique, police officers elicit an incriminating statement from an individual without giving *Miranda* warnings. *People v. Lopez*, 229 Ill. 2d 322, 358 (2008). Then, the police read the individual his or her *Miranda* warnings and obtain another incriminating statement. *Id.* To determine whether postwarning statements are admissible, we examine,

> " 'the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.' " *Id.* (quoting *Missouri v. Seibert*, 542 U.S. 600, 615 (2004) (plurality opinion).

¶ 28    In this case, the court found, and the evidence supports, the conclusion that the detectives did not deliberately use a "question first, warn later" technique. Both detectives testified that they did not utilize the technique during the interview, and the court found them to be credible. Moreover, while the basic content of defendant's admission before and after he was given *Miranda* warnings was the same, defendant provided a more detailed statement after he received his *Miranda* warnings. Accordingly, we hold that no error existed in admitting defendant's statements into evidence.

¶ 29                                    B. Motion for Mistrial

¶ 30   Defendant argues that the circuit court abused its discretion when denying defendant's motion for a mistrial after one of the investigating officers cried on the witness stand while the interview played for the jury.

> "A mistrial should be granted where an error of such gravity has occurred that the defendant has been denied fundamental fairness such that continuation of the proceedings would defeat the ends of justice. The trial court's denial of a mistrial will not be disturbed on review absent a clear abuse of discretion." *People v. Nelson*, 235 Ill. 2d 386, 435 (2009)

A trial court has a responsibility to conduct court in an orderly manner. *People v. Smith*, 2017 IL App (1st) 143728, ¶ 60. "Emotional outbursts, such as a witness crying, do not require the court to order a mistrial because it is in the best position to determine the impact on a jury of such outbursts." *Id.* However, the court must still ensure that a defendant stands trial before a fair and impartial jury and must take reasonable measures to do so. *Id.* The court is entitled to great deference in how it decides to handle these matters, because it can fairly assess what appropriate measure is necessary. *Id.*

¶ 31   After realizing Cook was crying, the court took appropriate measures to remove the jury before anyone else noticed. In denying defendant's motion for a mistrial, the court found that when Cook became emotional, his back was toward the jury and he was facing the judge, making it unlikely that anyone on the jury saw Cook crying. Additionally, the State and defense counsel did not even know that Cook had become emotional until the court excused the jury. There was no indication that anyone on the jury knew Cook cried. Even if someone on the jury noticed Cook becoming emotional, the court held that the motion to suppress was not overly prejudicial as to warrant a mistrial. Because the court is given discretion in making this decision, and it is clear

10

from the record that the court took appropriate measures to ensure the jury was not prejudiced by the display of emotion we find no abuse of discretion.

¶ 32                                    C. Sentencing

¶ 33        Defendant argues that the circuit court erred by imposing 12 consecutive natural life sentences for his convictions. He asserts that only one life sentence should be imposed. See 720 ILCS 5/11-1.40(b)(1.2) (West 2014). Defendant's argument requires us to review subsection 11-1.40(b)(1.2) of the Criminal Code of 2012 (Code). We review this statutory construction issue *de novo*. *People v. Harris*, 203 Ill. 2d 111, 116 (2003).

¶ 34        Subsection 11-1.40(b)(1.2) of the Code states: "A person convicted of predatory criminal sexual assault of a child committed against 2 or more persons regardless of whether the offenses occurred as the result of the same act or of several related or unrelated acts shall be sentenced to a term of natural life imprisonment." 720 ILCS 5/11-1.40(b)(1.2) (West 2014). The plain language of this subsection mandates the imposition of a life sentence for a predatory criminal sexual assault of a child conviction. *Id.*; see also *People v. McChriston*, 2014 IL 115310, ¶ 15 (when interpreting statutes, the best indicator of legislative intent is the statutory language, given its plain and ordinary meaning). Where a defendant has multiple predatory criminal sexual assault of a child convictions, the plain language of the subsection would require the imposition of natural life sentences on each conviction. Further, section 5-8-4(d)(2) of Unified Code of Corrections mandates the imposition of consecutive sentences for multiple predatory criminal sexual assault of a child convictions, as is the case here. 730 ILCS 5/5-8-4(d)(2) (West 2014).

¶ 35        Defendant relies on *People v. Palmer*, 218 Ill. 2d 148 (2006), to argue that he cannot receive consecutive life sentences, however, this case has been expressly overruled on this point by *People v. Petrenko*, 237 Ill. 2d 490, 504 (2010). *Petrenko* holds that under *Palmer*, a defendant

11

may not be subjected to consecutive life sentences under the Habitual Criminal Act, because the statute does not allow for it. *Id.* However, the court found that there may be instances where there is statutory authority for consecutive life sentences. *Id.* Because the statute under which defendant was sentenced authorizes one life sentence for each conviction and multiple convictions must be served consecutively, defendant's 12 natural life sentences for his convictions of predatory criminal sexual assault of a child is not in error.

¶ 36                                                III. CONCLUSION

¶ 37        The judgment of the circuit court of Will County is affirmed.

¶ 38        Affirmed.