2020 IL App (1st) 171283-U

No. 1-17-1283

Second Division
September 8, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellee, | ) ) | No. 11 CR 12305 |
| v. | ) ) | Honorable Geary W. Kull, |
| JERROD CROCKETT, | ) ) | Judge, presiding. |
| Defendant-Appellant. | ) | |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices Ellis and McBride concurred in the judgment.

**O R D E R**

¶ 1   *Held*: The trial court is affirmed where it denied defendant's motion to suppress his inculpatory statement to law enforcement because it was not coerced and where defendant's motion *in limine* was denied because the evidence was cumulative.

¶ 2   Following a bench trial, defendant, Jerrod Crockett, was found guilty of first-degree murder in connection with the shooting of Demetrius Delacy and sentenced to 50 years' imprisonment. On appeal, defendant contends that the trial court erred in denying his pretrial motions to (1)

suppress his statements to law enforcement and (2) admit a co-defendant's statement to a psychologist that the co-defendant lied to the police. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4                                A. Pretrial Proceedings

¶ 5     On July 9, 2011, Delacy was shot and killed following a house party in Maywood, Illinois. The following day defendant was arrested and charged with the shooting. Upon his arrest, defendant was transported to the Maywood Police Department and interrogated by Detectives Dennis Diaz and Charlie Porter. Lashon Bumpers, Cardell Fails, Darrius Ferguson, and Michael Smith were also arrested and charged with the shooting.

¶ 6     Prior to trial, defendant filed a motion to suppress statements he made while being interrogated. He claimed that the statements were a result of psychological and mental coercion, and that he made the statements in the process of plea negotiations because he was led to believe that he would receive a lesser sentence if he told the detectives what they wanted. The State, on the other hand, argued that the detectives never engaged in plea negotiations and defendant did not assert his right to remain silent.

¶ 7     A suppression hearing took place before the court on August 19, 2015, wherein the State submitted the video record of defendant's interrogation via Maywood Detective Dennis Diaz's testimony. Detective Diaz testified that in the early morning hours of July 9, 2011, he and his partner, Detective Porter, responded to the shooting of Sherrod Drane near 2nd Avenue and Harvard Street in Maywood. At approximately 2:20 a.m., they received a call that another individual, who turned out to be Delacy, had been shot near 1012 South 14th Avenue. The detectives went to the scene of Delacy's shooting and learned that Randy Caldwell was a witness to the shooting. They spoke with Caldwell at the scene and conducted a photo array, from which

he picked out defendant as the individual who shot Delacy and also Fails as being involved in the shooting.

¶ 8     The detectives then located Fails who told them that defendant, Lashon Bumpers, Michael Smith, and Darrius Ferguson were involved in the shooting. In separate interviews, Bumpers, Smith, and Ferguson all stated that defendant was involved in the shooting, with Smith and Ferguson claiming that defendant pulled the trigger.

¶ 9     Detective Diaz located defendant at about 6:44 p.m. on July 10 and transported him to the police station. Defendant's first interview was recorded. Defendant was read his *Miranda* rights and defendant signed a *Miranda* waiver. Detective Diaz testified that at no point during the interview did defendant state that he did not want to talk anymore or that he wanted to remain silent.

¶ 10    Detective Diaz continued that after the first interview, a lineup was conducted at the police station and Caldwell identified defendant as the individual that shot Delacy. A second interview with defendant, which lasted approximately 40 minutes, was conducted and was also recorded. Detective Diaz testified that defendant did not indicate that he wished to invoke his right to remain silent and also affirmed that defendant was not spoken to off camera at any point. On cross-examination, Detective Diaz confirmed that defendant was 18 years old at the time he was arrested.

¶ 11    The discs containing the interviews were admitted into evidence for the court to review. The videos, which have been made a part of the record on appeal, show the following:

¶ 12    During the first interview, defendant acknowledged that he was given water to drink, food to eat (as evidenced by McDonald's wrappers on the table) and was permitted to use the restroom. Defendant was also given cigarettes to smoke during the interviews. At the beginning of the interview, defendant agreed that he had been treated well. Detective Porter reviewed the Miranda

waiver form with defendant, who then signed and initialized the form where designated. He stated that he did want to speak with the detectives.

¶ 13    Defendant stated that Ferguson picked him up from his house about 10:30 p.m. on the night of the shootings to go to the party on 2nd Avenue. They also picked up Smith on the way. They paid to get into the party, where they danced and drank liquor. Defendant stated that Drane, at first, could not get into the party because he did not have any money, though he did get in later. At some point, defendant went outside and observed his friends speaking to the driver of a white Chrysler Concorde. Shortly thereafter, a shooting occurred. Defendant ran to Eric Bynum's house near 17th Avenue. While there, Bumpers received a phone call that Drane had died. Defendant stated that everyone there started crying. He stated that he was very close with Drane. At some point, a white Ford Thunderbird drove down the street and the people outside threw bottles and bricks at the car. Smith and Ferguson got in Ferguson's car and unsuccessfully chased after the Thunderbird. Defendant then went to his house and charged his phone. Subsequently, Devonte Halem picked up defendant and took him to Halem's house where they sat outside talking until 6 a.m.

¶ 14    At this point, the detectives interrupted defendant and stated that he was lying about what occurred following the phone call that Drane had died. Detective Diaz asked defendant multiple times how defendant felt when he learned of Drane's death and he asked him several times, "Were you pissed off?" Defendant responded that he could not believe that it happened and that he was sad. Detective Diaz told defendant that he could understand what defendant did and that he was not going to judge defendant for how he reacted but that they knew the truth of what occurred from his co-defendants. Defendant told detectives that he was not in Fails' car that night. Detective Porter informed defendant that several people placed defendant in Fails' car, and they fingered defendant as the individual with the gun who shot Delacy. Detective Porter stated that they were

going to go with the co-defendants' version, rather than defendant's. The detectives also informed defendant that they were told that defendant urinated on his hands to get rid of the gunshot residue and that he burned his clothing at 2nd Avenue and Green Street. Detective Porter stated that none of defendant's "boys" were going to lie for him. Detective Porter told defendant to "help himself" and to stop lying. Detective Porter then left the interview room for a few minutes. Upon his return, he stated that he just spoken with Halem, who told him that defendant showed up at his house on a bicycle around 7:30 a.m. and that he did not pick up defendant, as defendant claimed. Defendant insisted he told the truth, and the detectives ended the interview.

¶ 15    A second interview with defendant occurred approximately 16 hours later, which was also recorded and lasted approximately 40 minutes. Defendant, again, was read his *Miranda* rights, signed a second waiver form, and did not indicate that he wished to invoke his right to remain silent. Defendant was given food and drink and was permitted to use the restroom.

¶ 16    Detective Porter then told defendant that the police had the bicycle he rode to Halem's house and that his co-defendants were sticking with their stories. Porter stated that defendant was going to serve some prison time, but his honesty during the interview would determine how much time.

¶ 17    Defendant stated that after the Thunderbird drove by, he rode a bicycle to Halem's house and slept outside until morning.

¶ 18    The detectives told defendant that he was still lying and that he was facing a lifetime in prison because he was still lying. They explained that they had independent witnesses placing defendant at Delacy's murder; gas station videos; the burnt clothes that defendant dumped at 2nd and Green; and the bicycle from Halem's house. Detective Porter continued that the State was probably going to cut a deal with his co-defendants because they were honest, and that he was

trying to help defendant get "up out from some of this time" and "get some of these years knocked off" and that defendant was looking at some "major f*** time" by claiming that he was not even there. Both detectives continued for several minutes to urge defendant to stop thinking, tell the truth, and help himself.

¶ 19    Detective Porter stated that defendant was going to jail regardless and Detective Diaz stated that it was up to defendant to determine how long. Defendant asked what charges he was facing, and in response Detective Porter stated that he was going with "the maximum." Detective Diaz commented that it was not up to them how many years defendant was going to be sentenced. Detective Porter stated that the State's Attorney was going to ask for his opinion though and he was going to tell the State's Attorney that defendant lied the entire time. Detective Diaz then stated: "Eventually you'll get out, depending you know, how much time you get. I don't know. That's not really up, up to us man. It's not up to me." Defendant interjected "I know." Detective Diaz continued, "It's not up to Porter. So I couldn't tell you. It's not, it's not my position to tell you."

¶ 20    Detective Diaz then asked defendant if he killed Delacy and defendant nodded in agreement. Detective Diaz told defendant that he needed to respond verbally, and defendant responded, "yes." The detectives asked defendant what happened, and he told them that he was "not thinking straight." Defendant then stated that they all got into Fails' car, saw Delacy on 13th Avenue, and "did that to him, they stomp him, and it was over with after that." The detectives asked for defendant to explain what happened after he learned that Drane had died. Defendant stated that he was "all mad" and he went to Ferguson's to get the gun and then they found Delacy on 13th Avenue. He stated that the shooting did not happen from the car; that they "got Delacy on foot;" and that Fails stayed in the car. Defendant stated that he did not know how many times he pulled the trigger; when "it was done," he ran away; and when he looked back, he saw the others

kicking Delacy. They all ran back to Maywood Drive where Fails was waiting. They went back to Ferguson's house, and defendant gave Ferguson the gun. He also took off his clothes at Ferguson's and, after going to the gas station, Ferguson burned the clothes. They then went back to Bynum's house and drank some liquor. Defendant denied urinating on his hands and stated that he did not think urine could remove gunshot residue.

¶ 21    In the final moments of the interview, Detective Diaz asked defendant if he was sorry, to which defendant responded that he was sorry that he "f*** up." Defendant then asked if the confession would "make it better." Detective Porter responded that "it makes it a whole lot better" and that defendant did not need to spend his whole life in prison. The detectives then ended the interview.

¶ 22    Prior to ruling on the motion to suppress, the trial court confirmed with the parties that no discussion occurred that was not shown on the discs and that the representations that the detectives made to defendant regarding the other evidence they had were all accurate. The court then denied the motion. In so ruling, the court made the following factual findings: plea negotiations did not occur during the interview, defendant did not invoke his right to remain silent, and the interview was not particularly coercive in nature.

¶ 23    On December 2, 2015, defendant filed a motion to reconsider, arguing that the detectives' offers of leniency rendered his statements involuntary. The court denied the motion, reasoning that there was no specific promise of leniency and that the questioning did not "cross[ ] over a boundary that the courts do not permit."

¶ 24    On August 29, 2016, defendant filed a motion *in limine* seeking, *inter alia*, to admit medical and mental health evidence of co-defendants, Lashon Bumpers and Michael Smith, at trial. As related to this appeal, defendant specifically requested that the court allow a statement Smith made

to a Cook County psychologist that he lied to the detectives about being present at the murder scene. At the hearing on the motion, defense counsel informed the court that it was going to introduce similar statements Smith made to his brother during a jail phone call denying his presence at Delacy's shooting.

¶ 25    The court ruled that Smith's diagnosis and the medication he was taking at the time of the shooting and interrogation were relevant. The court ruled that nothing that occurred in the jail or years prior to the shooting were relevant. As to Bumpers, the court ruled that any medical diagnosis would be relevant and that he could be questioned about his use of marijuana but only if he denied it first. Finally, as to Smith's statement that he lied to the police about being present at the shooting, the court stated that the statement would be cumulative and that it may be privileged as a communication between Smith and a psychiatric social worker.

¶ 26                                    B. Trial

¶ 27    The following evidence was adduced at trial.

¶ 28    Maywood police officer Eric Dent testified that around 2:24 a.m. on July 9, 2011, he received a report of a man shot near 1012 South 14th Avenue. At that location, he found an unresponsive black male laying on his back in the alley.

¶ 29    Maywood police officer Donna Lewis, an evidence technician, testified that she was assigned to process the scene near the 1000 block of South 14th Avenue on July 9. She found two rifle shell casings and photographed the body.

¶ 30    Maywood police sergeant Wayne Welch testified as an evidence technician that he went to the scene of the shooting about 2:30 a.m. on July 9. Later that day, he was also assigned to process a vehicle, a white Buick Regal, at the Maywood Police Department. After photographing the vehicle, he searched it pursuant to a warrant. In the trunk, he observed a Winchester .308 rifle.

¶ 31     Detective Diaz testified consistent with his testimony from the suppression hearing. He further testified that Ferguson's white Buick Regal was taken to the Maywood Police Department when Ferguson was taken into custody. He testified that Bumpers took him to an alley where he observed a small pile of what appeared to be burnt clothing. Testing was not conducted on the material recovered from the alley. Detective Diaz also summarized defendant's videotaped confession during the second interview conducted on July 11, 2011.

¶ 32     On cross-examination, Detective Diaz acknowledged that defendant, in his confession, did not reveal any details of the shooting that detectives had not already told him.

¶ 33     The parties stipulated that forensic scientist, Fred Tomasek, a firearms identification expert, examined the recovered rifle and the two shell casings from the scene and concluded, to a reasonable degree of scientific certainty, that the shell casings were fired from the rifle.

¶ 34     The parties stipulated that Cook County Medical Examiner Doctor Ponni Arunkumar[1] would testify that Delacy's autoposy revealed gunshots wounds to the chest and left side of the face, as well as several other injuries to the head and neck that were consistent with blunt force trauma and possible kicking. Dr. Arunkumar concluded that the cause of death was multiple gunshots wounds.

¶ 35     Smith testified at trial and stated that his testimony was pursuant to a plea agreement, under which he would receive a 15-year sentence to be served at 50% for conspiracy to commit murder. Smith testified that he was taking the antidepressant Effexor twice a day. On the night of July 8, 2011, Smith, who was then 17 years old, went to a party in Maywood with Ferguson and defendant. At the party, Smith drank two cups of liquor and smoked marijuana. As he was leaving the party,

_____

[1] In the transcript, Dr. Arunkumar's first name was identified as Tony, but documents in the record indicate that it is, in fact, Ponni.

shooting began and Drane was shot. Later, Smith went to Bynum's house because "that's where everybody was at." When he arrived, he saw defendant, Fails, Ferguson, and Bumpers. While there, he learned that Drane had died. Sometime after, as Smith was riding a bicycle down the street to purchase cigarettes, a white car drove by and tried to hit him. Smith stated that the men in the car were "the dudes who shot at us[.]" Smith, Bumpers, Ferguson, Fails, and defendant decided to go look for Delacy because they heard that he was involved in Drane's death. They all rode together in Fails' vehicle to defendant's house. Defendant entered his house and returned after a couple minutes with a large gun. They continued driving around until they found Delacy, who was with Caldwell. Fails dropped them off at the corner of 14th Avenue and Maywood Drive. Caldwell left, and they walked towards Delacy. Smith, Bumpers, and Ferguson all punched Delacy. Then, defendant shot Delacy twice and hit him with the end of the gun. Smith and the others punched and kicked Delacy as he was laying on the ground. They then met up with Fails, went to his house, and transferred to a pickup truck. Eventually, Smith went home and later learned that the police were looking for him.

¶ 36    On cross-examination, Smith acknowledged that during a phone call from the jail with his brother he stated that he had nothing to do with Delacy's murder, that he was forced to make a statement at the police department, and that he was in a car with Fails but he was not involved in the shooting. Smith confirmed that he was diagnosed with bipolar disorder. He also stated that at the time of his interview with law enforcement he was not taking any medication but now takes Effexor twice daily.

¶ 37    On redirect examination, Smith stated that he did not tell his brother that he was present at the shooting because he did not want him to be disappointed in Smith.

¶ 38    Bumpers' testimony was also pursuant to a plea agreement wherein he would receive a 15-year sentence to be served at 50% for conspiracy to commit murder. He stated that on July 8, 2011, he attended the 2nd Avenue party with "Bam" and Drane. While there, he drank alcohol and smoked marijuana. Eventually, he lost Drane and began looking for him when he received a phone call informing him that Drane had been shot. Bumpers went outside and observed Drane on a stretcher being placed in an ambulance. He later received a phone call from Drane's brother informing him that Drane had died. While outside, a white car drove by the house, the individuals in the car yelled something "disrespectful," and tried to knock Smith off a bicycle. He, Smith, Ferguson, and defendant then followed the white car in Fails' car and eventually saw Delacy and Caldwell walking on the street. At that point, he believed that Delacy was involved in Drane's murder. They drove to defendant's house, and defendant went inside and came out with a rifle. Near 13th Avenue and Maywood Drive, everyone except Fails exited the car. He stated that no one, other than defendant, had a weapon. They began walking towards Delacy and Caldwell. He observed Caldwell and Delacy shake hands and then Caldwell walked away. He stated that defendant raised the gun and Delacy tried to run away. Defendant shot three times at Delacy. One of the shots struck Delacy and he fell to the ground. Bumpers stated the gun jammed and defendant hit Delacy in the face with it. Bumpers then kicked Delacy several times, as did Smith and Ferguson. They got back into Fails' car and drove to Ferguson's house. Defendant put the gun in the trunk of Ferguson's car, a white Buick Regal. At some point, they switched from Fails' car to a pickup truck and drove to an alley where defendant took off his pants and burned them in a garbage can. Ferguson then dropped Bumpers off at Drane's house.

¶ 39    On July 10, 2011, Bumpers went to the Maywood Police Department because they called his mother and said they wanted to question him about the murder. He testified that during his

interview with the detectives, he did not tell the whole story because he wanted to limit his involvement. He also took detectives to the location where the clothes were burned and helped them locate defendant.

¶ 40    On November 8, while Bumpers was in Cook County Jail, defendant told Bumpers to testify that Delacy was armed to help him get second degree murder. Defendant also told Bumpers to relay the same message to Smith.

¶ 41    On cross-examination, Bumpers stated that he drank two or three cups of Cognac and smoked marijuana on the night of the shooting. He denied that after his arrest he was prescribed Haldol, Lorazepam, Risperidone, or Depakote. He stated he was only prescribed medication for migraines and acid reflux.

¶ 42    The State rested its case, and defendant moved for a directed finding, which the court denied.

¶ 43    The parties stipulated that Bumpers was diagnosed with substance-related disorders, marijuana dependence, and an unspecified mood disorder. He was prescribed Risperidone, an antipsychotic medication, and Divalproex, a medication to treat the manic phases of bipolar disorder. These were later discontinued, and Bumpers was prescribed Haldol and Lorazepam.

¶ 44    The parties also stipulated that Smith was diagnosed with substance-related disorders and mood disorders. He was prescribed Risperidone and Divalproex.

¶ 45    The court ultimately found defendant guilty of 12 counts of first-degree murder. The court stated that although there were inconsistencies in the witnesses' testimony, it believed that defendant shot Delacy. The court denied defendant's motion for a new trial. Following a sentencing hearing, the court merged the twelve counts into one and sentenced defendant to

consecutive prison sentences of 25 years for first-degree murder and 25 years for the discharge of a firearm.

¶ 46                                   II. ANALYSIS

¶ 47                              A. Motion to Suppress

¶ 48     On appeal, defendant first argues that the trial court erred in denying his pretrial motion to suppress his inculpatory statements because they were involuntary and coerced. For that reason, defendant asserts that we must reverse his conviction and remand for a new trial. The State responds that the court properly denied the motion to suppress where, under the totality of circumstances, his statement was voluntary, and the detectives did not make a specific promise of leniency.

¶ 49     A trial court's ruling on a motion to suppress is subject to a bifurcated standard of review. *Ornelas v. United States*, 517 U.S. 690, 699 (1996); *People v. Johnson*, 237 Ill. 2d 81, 88 (2010). Under this standard, a reviewing court first accords great deference to the trial court's findings of fact and disregards those findings only where they are against the manifest weight of the evidence. *Johnson*, 237 Ill. 2d at 88. However, the trial court's ultimate legal conclusion as to whether suppression is warranted is subject to *de novo* review. *People v. Colyar*, 2013 IL 111835, ¶ 31. Consequently, a reviewing court "remains free to engage in its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted." *People v. Crane*, 195 Ill. 2d 42, 51 (2001). In reviewing a ruling on the suppression of inculpatory statements, we may consider all the evidence adduced at the suppression hearing and at trial. *People v. Slater*, 228 Ill. 2d 137, 149 (2008).

¶ 50     Both the federal and state constitutions prohibit the admission of a defendant's statement that was made involuntarily. *People v. Nicholas*, 218 Ill. 2d 104, 118 (2005). The State has the

burden of proving that the confession was voluntary by a preponderance of the evidence. *Slater*, 228 Ill. 2d at 149. As set out by our supreme court, the basic test for determining the voluntariness of a statement, based upon the totality of the circumstances before the court, is whether "it has been made freely, voluntarily[,] and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed." *People v. Prim*, 53 Ill. 2d 62, 70 (1972). More recently, Illinois courts have further delineated this basic test to include a specific set of factors to consider in the voluntariness assessment. These factors are: (1) the presence of *Miranda* warnings; (2) the defendant's personal characteristics, including his age, intelligence, background, experience, mental capacity, and physical condition at the time of questioning; (3) the legality and duration of the detention and questioning; (4) the conditions of detention; and (5) whether any threats, promises deception, guilty or other coercive tactics were used in inducing the confession. *Slater*, 228 Ill. 2d at 160.

¶ 51     Defendant does not allege that his age, intelligence, background, experience, mental capacity, education, physical condition, or the circumstances of his detention affected the voluntariness of his confession. Moreover, as we will explain later in this order, based on the record, none of those factors appear to be applicable under the circumstances before us. Instead, defendant solely alleges that his confession was involuntary because the detectives made representations to him that his sentence would be reduced if he confessed. Thus, defendant relies, for his argument, on the fifth factor listed above: whether any promises were used in inducing the confession.

¶ 52     Evidenced by its inclusion in the list of factors above, Illinois courts have long recognized offers of leniency as "a factor to be considered in determining whether a statement is voluntary." *People v. Ruegger*, 32 Ill. App. 3d 765, 769 (1975). "To constitute a promise of leniency, the

statement must be coupled with a suggestion of a specific benefit that will follow if defendant confesses." *People v. Johnson*, 285 Ill. App. 3d 802, 808. This, however, does not make the statement *per se* inadmissible where the totality of the circumstances suggest that it was made voluntarily. *People v. Lee*, 2012 IL App (1st) 101851, ¶ 34; see also *People v. Jones*, 8 Ill. App. 3d 849, 853 (1972) (stating that confessions may be admissible, despite promises of leniency, where the evidence as a whole demonstrates that the statement was voluntary) and *People v. Murdock*, 2012 IL 112362, ¶ 30 (stating that no single factor is dispositive).

¶ 53 Because the court's factual findings upon which it made its decision to admit the confession as a voluntary statement were based solely on facts gleaned from the interviews and did not require any credibility determinations, we review *de novo* whether the court's application of the facts in the record to the law correctly resulted in a denial of defendant's motion to suppress. But see *People v. Valle*, 405 Ill. App. 3d 46, 56-58 (2010) (refusing to apply this standard where "the trial court [ ] heard live testimony relating to a disputed issue of fact"). During the interviews, the detectives repeatedly implored defendant to help himself, to stop lying, and to tell them the truth. The detectives relayed to defendant the evidence they had that suggested that he shot Delacy. They also repeatedly told him that his co-defendants had already helped themselves and fingered defendant as the shooter. Detective Porter told defendant that there was going to be some "major f*** time" involved but that the interview was going to determine how much time. He also stated that he was trying to help defendant "get up out from some of this time" and "get some of these years knocked off." Detective Diaz was quick to follow up Detective Porter's comments to defendant regarding doing time with a clarifying statement that defendant's sentence was not up to them. At one point, Detective Diaz stated: "Eventually you'll get out, depending you know, how much time you get. I don't know. That's not really up, up to us man. It's not up to me." Defendant

then interjected "I know." Detective Diaz continued, "It's not up to Porter. So I couldn't tell you. It's not, it's not my position to tell you."

¶ 54    The State contends that the detectives' statements were not specific promises of leniency but were more akin to "mere exhortation[s] to tell the truth" (*People v. Wipfler*, 68 Ill. 2d 158, 173 (1977)) and "advisements to make statements" (*Jones*, 8 Ill. App. 3d at 852), which do not necessarily make the confession involuntary. The tapes of defendant's interrogation sessions have been made a part of the record on appeal. In addition to the record, we have reviewed those tapes in their entirety. Having completed our review, we agree with the State's assessment. The detectives' suggestions that defendant might receive less jail time if he told the truth does not constitute a specific promise but is more akin to an advisement to tell the truth. Their statements tend to imply that honesty would help defendant in the situation in which he found himself. The detectives also qualified their statements by adding that defendant's sentence was ultimately not up to them to decide, and at one point, defendant indicated that he knew that the detectives could not decide his sentence. This qualifier, and defendant's express understanding of it, significantly lessened the alleged coercive nature of the detectives' statements. Additionally, the detectives never misrepresented to defendant that he could avoid serving any time in jail if he confessed; to the contrary, the detectives told defendant that he needed to "forget about walking out of here" and that whether he confessed or not, defendant would be spending time in jail based on the evidence they already had that pointed to him as the shooter. See *People v. Kronenberger*, 2014 IL App (1st) 110231, ¶ 47 (finding that the confession was voluntary where the detectives advised the defendant repeatedly to tell the truth but never made any suggestion that he would "escape legal consequences if he confessed").

¶ 55    Nonetheless, in support of his argument, defendant cites to several cases in which the reviewing court held the confession was made involuntarily. However, each case is distinguishable.

¶ 56    In both *People v. Ruegger*, 32 Ill. App. 3d 765 (1975), and *People v. Phillips*, 2018 IL App (3d) 130270, the reviewing court held that the defendants' confessions were involuntary because the interviewers made specific offers to help the defendants. In *Ruegger*, defendant's interrogator was a relative who offered to "go to bat" for the defendant on such matters as a recognizance bond and probation if he confessed. 32 Ill. App. 3d at 771. Here, in contrast, Detectives Diaz and Porter made no specific promise of special treatment. See *People v. Eckles*, 128 Ill. App. 3d 276, 279 (1984) (distinguishing *Ruegger* where the police did not make a specific promise of leniency, but simply told the defendant they would inform the prosecutor and court of his cooperation). Similarly, in *Phillips*, during the defendant's questioning, the detective informed the defendant that "[a] lot of things can change, including that charge, if the truth *** comes out of your mouth." 2018 IL App (3d) 130270, ¶ 47. The reviewing court found the defendant's statement to be involuntary because the detective specifically stated that the defendant's charge could change if he confessed and the detectives did not clarify that they had no power over the charges levied against the defendant. *Id.* ¶ 51. In contrast, here, the detectives did not suggest that defendant could receive a lesser charge for telling the truth and the detectives clarified their statements more than once that they were not the ones who would determine defendant's sentence.

¶ 57    Lastly, in *People v. Heide*, 302 Ill. App. 624, 628 (1922), the record showed that police officers stated to defendant that "the best thing would be for him to tell the truth; that if he did he would be taken to the [S]tate's [A]ttorney's Office and the [S]tate's [A]ttorney would do the best for him" and that "the [S]tate's Attorney might show him leniency; that if there was any leniency

to be shown it would be shown at the [S]tate's [A]ttorney's office, and if they told the truth he would take them to the [S]tate's [A]ttorney's office." The reviewing court found the defendant's confession to be inadmissible under these circumstances because "the effect and influence of their statements were to raise a hope of leniency in the [mind] of [the defendant]." *Id.* at 629. Several decades later, our supreme court in *People v. Hartgraves*, 31 Ill. 2d 375, 381 (1964), distinguished its facts from the facts in *Heide*. In *Hartgraves*, the police officer told the defendant "[i]t would go easier on him in court if he made a statement." *Id.* at 381. The court held that the officer's statement was "in no way [a] direct promise of leniency[.]" *Id.* "Such a mere suggestion of the advisability of making a statement does not in itself render a confession involuntary." *Id.* We find *Hartgraves* instructive. Like in *Hartgraves*, the statements made here are more akin to advising defendant that telling the truth could help him when his sentence is decided. See also *People v. Johnson*, 285 Ill. App. 3d 802, 809 (1996) (confession was not rendered involuntary by officers' statement that if the defendant told the truth the judge would see he cooperated and might take that into consideration); *People v. Makes*, 103 Ill. App. 3d 232, 240 (1981) (confession was not excluded where police told the defendant "things may go easier" if she made a statement).

¶ 58    Having determined that there was no specific promise of leniency, our analysis does not end there.  We are mindful that "[n]o one factor can be relied upon in determining the voluntariness of the statement, but such must be determined from all the circumstances surrounding its making." *Jones*, 8 Ill. App. 3d at 852-53. The ultimate question on a motion to suppress an inculpatory statement is "whether, considering the totality of attendant circumstances, the defendant's will was overcome at the time he confessed." *Eckles*, 128 Ill. App. 3d at 278-79. Thus, we consider the following additional factors as set out in *Slater:* (1) the advisement of *Miranda* rights; (2) the defendant's personal characteristics, including his age, intelligence, background, experience,

mental capacity, and physical condition at the time of questioning; (3) the legality and duration of the detention and questioning; and (4) the conditions of detention. 228 Ill. 2d at 160.

¶ 59 Defendant was advised of and waived his *Miranda* rights before each interview. He was asked if he wanted to speak to the detectives, which he answered affirmatively. Defendant's characteristics and condition at the time of the interviews do not suggest that his will would be more easily overborne or that he was prone to any coercive tactics. The record shows that defendant was 18 years old at the time of his arrest, he had finished only his first year of high school, and he had no known behavioral or learning disorders. Though he was young, he was not unfamiliar with the criminal justice system as he had a prior felony conviction on his record. See *People v. Walker*, 2012 IL App (1st) 083655, ¶ 42 (noting that the defendant was familiar with the criminal justice system in finding that his statement was voluntary). The interviews also demonstrate that defendant was able to understand and follow the detectives' line of questioning without issue and he was able to give coherent responses to the questions posed to him. At no point does defendant appear confused by his *Miranda* rights or the questions. See *Murdock*, 2012 IL 112362, ¶ 44 (finding that the defendant appeared "to be of normal intelligence and mental capacity for someone his age"); *People v. Kochevar*, 2020 IL App (3d) 140660-B, ¶ 25 (finding the defendant to be an "18-year-old high school senior of average or better intelligence"). Moreover, the detectives did not physically injure or threaten defendant at any point during the interviews and there is no sign in the interviews that defendant is suffering from any physical impairment that would affect the voluntariness of his statement. See *id.* ¶ 46 (finding that the defendant was "in good physical condition during his detention and interview" and did "not appear to be in any type of distress").

¶ 60 Additionally, the detention itself weighs in favor of a finding of voluntariness. For instance, defendant was questioned twice over the course of 23 hours; the interviews lasted less than two hours each; defendant was given food, drink, and cigarettes; and he was allowed to use the restroom. Defendant also agreed at the beginning of the interview that he had been treated well. In view of these facts, we cannot say that the environment in which defendant was questioned was coercive.

¶ 61 Based upon our review of the record, we do not believe that defendant's will was in anyway overborn or that his statement was inappropriately coerced. Instead, it appears to us that defendant made his confession, voluntarily, after being confronted with the vast amount of evidence that specifically contradicted his original version of what occurred. See *Hartgraves*, 31 Ill. 2d at 381 ("A reading of the entire record indicates by overwhelming weight of the evidence that defendant voluntarily confessed after being confronted with accusatory statements of two other persons involved in the crime."). Thus, based on the totality of the circumstances, we conclude that the trial court correctly denied defendant's motion to suppress. Finding no error, we need not address the parties' arguments as to whether the admission of defendant's statement constituted harmless error.

¶ 62                                B. Motion *in Limine*

¶ 63 Next, defendant contends that his conviction should be reversed because the trial court erred in barring Smith's statement to his psychologist that he lied to law enforcement about being present during the murder. He maintains that the court ruled "in part" that the evidence was not admissible because the communication was privileged. He argues that the court committed error because the statement was admissible under a statutory homicide exception to the confidentiality of mental health records. Defendant claims this error denied him his constitutional right to confront

witnesses against him, requiring reversal. Alternatively, he claims that error regarding privilege, coupled with the court's erroneous denial of his motion to suppress, cumulatively denied him a fair trial requiring remand for a new trial. The State responds that the trial court correctly denied defendant's motion because the evidence was cumulative.

¶ 64    "A motion *in limine* is addressed to a trial court's power to admit or exclude evidence or argument." *In re Commitment of Lingle*, 2018 IL App (4th) 170404, ¶ 47. A trial court's ruling on a motion *in limine* is generally reviewed for abuse of discretion (*id.*), which occurs only when the trial court's ruling is arbitrary, fanciful, or such that no reasonable person would take the view adopted by the trial court (*People v. Morgan*, 197 Ill. 2d 404, 455 (2001)). Here, however, defendant claims that the standard of review is *de novo* because the court's evidentiary ruling was " 'frustrated by an erroneous rule of law.' " *People v. Caffey*, 205 Ill. 2d 52, 89 (2001) (quoting *People v. Williams*, 188 Ill. 2d 365, 369 (1999)). Specifically, defendant contends that the court based its decision in part on an erroneous belief that Smith's statement to his psychologist was privileged. Under either standard, defendant's argument fails. Having determined that no error occurred in the trial court's denial of defendant's motion to suppress his confession, we need not address his cumulative error argument and focus our analysis instead, on defendant's claim that he was denied the right to confront a witness.

¶ 65    In considering defendant's motion, the court stated, "It becomes *** cumulative. And *** because of the psychiatric nature of it and my hesitancy because of the fact that it may be, in fact, privileged communication between [Smith] and the psychiatric social worker *** and he says that to someone who can perfect your impeachment on, you don't have to do this again by this conversation."

¶ 66    Before proceeding, we set out the applicable legal principles relevant to defendant's claims. Both the United States and the Illinois constitutions guarantee every defendant the right to confront witnesses against him. U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8. The right includes the right to cross examine a witness as to the witnesses' biases, interests, or motives to testify. *People v. Triplett*, 108 Ill. 2d 463, 486 (1995). Denial of the right is reversible error. See *id*.

¶ 67    "Cumulative evidence is additional evidence of the same kind bearing upon the same point[.]" *People v. Nahas*, 9 Ill. App. 3d 570, 578 (1973). Evidence is considered cumulative when it adds nothing to what was already before the trier of fact. *People v. Ortiz*, 235 Ill. 2d 319, 335 (2009). Admissibility of such evidence rests within the sound discretion of the trial court and absent an abuse, the court's ruling will not be reversed. *People v. Tolliver*, 347 Ill. App. 3d 203, 227 (2004).

¶ 68    Finally, under the Medical Health and Developmental Disabilities Disclosure Act, mental health records may be disclosed in the investigation of trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide. See 740 ILCS 110/10(a)(9) (West 2011).

¶ 69    Regardless of whether the court denied defendant's motion "in part" because it believed the statement was privileged, the court also clearly ruled that the statement was cumulative in light of the other evidence that was to be admitted at trial, namely Smith's nearly identical statement on the jail phone call to his brother. We know of no requirement that a court allow evidence merely because it is admissible, especially when, like here, that evidence is merely cumulative. On the contrary, it is within the trial court's discretion to limit the number of impeaching witnesses. *People v. Van Zile*, 48 Ill. App. 3d 972, 979 (1997); see, e.g., *People v. Montague*, 182 Ill. App. 3d 737, 750 (1989).

¶ 70    Defendant maintains, however, that Smith's statement to his psychologist was not cumulative of other trial evidence. Further, he argues that Smith would have had no reason to lie to his psychologist, which enhanced the statement's credibility regarding Smith's absence during the shooting but diminished it regarding his identification of defendant as the shooter. We disagree with defendant's characterization of Smith's barred testimony as noncumulative and further that he was denied his right to confront this witness. In presenting the motion defense counsel indicated to the court that it intended to introduce similar statements that Smith had made to his brother during a jail phone call and, on cross examination, that testimony was in fact elicited. That defendant was not permitted to further impeach Smith with the same statement was not a denial of his confrontation rights. Further, that an identical statement made to two different individuals might conceivably increase the statement's weight and credibility does not render the statement non-cumulative. Testimony that Smith had made a statement to his treatment provider similar to the statement he made to his brother would have added nothing to what was already before the trier of fact. We find no abuse of discretion in the trial court's decision to exclude Smith's statement to his treatment provider and, thus, in denying defendant's motion.

¶ 71    Further, and contrary to defendant's assertion otherwise, the evidence of defendant's guilt was overwhelming. In addition to defendant's uncoerced confession, there was testimony from Detective Diaz that Caldwell identified defendant in a photo array and later in a line-up as the shooter. Additionally, Bumpers and Smith, both of whom, with the trial court's knowledge, testified pursuant to plea deal, testified that defendant shot Delacy. Further, the forensic evidence presented at trial, which included the recovered rifle and shell casings, not only corroborated defendant's confession but also the testimony at trial. Thus, even if the trial court's denial of the motion *in limine* was error, the error was harmless beyond a reasonable doubt.

¶ 72                                    III. CONCLUSION

¶ 73    For the reasons stated, we affirm the judgment of the circuit court.

¶ 74    Affirmed.