2021 IL App (1st) 191512

FIRST DIVISION
June 28, 2021

No. 1-19-1512

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellee, | ) ) | Cook County |
| v. | ) ) | No. 17 CR 17687 |
| | ) | |
| WILLIAM VOSE, | ) ) | Honorable Stanley Sacks, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE PIERCE delivered the judgment of the court.
PRESIDING JUSTICE WALKER and JUSTICE HYMAN concur in the judgment only.
PRESIDING JUSTICE WALKER and JUSTICE HYMAN also specially concur.

**ORDER**

¶ 1    *Held*:    The trial court did not err in denying defendant's motion to suppress. The trial court did not err in allowing opinion testimony.

¶ 2    Defendant was convicted of driving under the influence and was sentenced to 3 years' imprisonment.  Defendant appeals and argues that the trial court erred in denying his motion to suppress statements and the trial court erred in allowing opinion testimony of Trooper David. For the following reasons, we affirm the judgment of the circuit court.

¶ 3                                BACKGROUND

¶ 4      Prior to trial, defendant, William Vose, filed a motion to suppress statements arguing that

he was subject to a custodial interrogation without having received *Miranda* warnings.

At the hearing on the motion to suppress statements, defendant called Trooper Eric David, who

testified that on August 26, 2017, at approximately 2:16 a.m., he was called to Dan Ryan

Expressway/I-94 southbound at Roosevelt Road. He was responding to a call from dispatch

indicating that a citizen had called and reported that defendant was asleep at the wheel, was

throwing up and was driving erratically. He arrived at the scene, which was an active

construction site, and saw a red Chevy Silverado pickup truck cross several lanes of traffic and

pull over on the right shoulder. Defendant was driving the truck.  He stopped the vehicle, walked

towards the back and then got back into the truck. Trooper David testified that he pulled up

behind defendant's vehicle and got out of his squad car. While he was at the scene, the citizen

that made the call approached to talk to him.  The citizen identified defendant as the person he

saw throwing up from his car and driving erratically.

¶ 5      David testified that he was the first trooper on the scene and when he approached

defendant's truck, he was in full uniform with his badge exposed. He approached the vehicle on

the driver's side and instructed defendant, who was the driver, to turn off the engine. He spoke to

defendant at this point to find out why defendant stopped on the shoulder and if he was okay to

drive. David stated that he observed defendant was very slow to respond, his movements were

very slow, defendant had a strong odor of alcohol on his breath and his eyes were bloodshot and

glassy. David stated he went back to his squad car at which time defendant began vomiting out

the driver's side of the truck. At that point, David instructed defendant to give him his car keys

because he felt that defendant was not safe to drive.  David asked defendant for his driver's

license, which defendant eventually produced.

¶ 6　　David called for a Department of Transportation "help truck" to relocate off the highway, due to the heavy traffic in the construction zone where they were located, where he would offer defendant a field sobriety test. David asked defendant which way he was going, and defendant stated that he was going north. David corrected him and told him that he was going south. David explained to defendant that he wanted to make sure that it was safe for defendant to keep driving and that they were in a very busy, active construction zone and he wanted to relocate him off of the highway.  He then asked defendant to get out of his truck and when he did, David patted him down for defendant's safety and his own because defendant was going to be riding in the rear of his squad car.  David then walked defendant to the rear seat of his squad car and had him sit in the back. The inside of the back seat had door handles to exit the car.

¶ 7　　David then drove defendant about a half mile away to the 18th Street exit ramp where there was a sidewalk. He explained to defendant why he was moving them to this new location. While driving there, defendant told him that he wanted to go home but David did not let defendant go home.

¶ 8　　When they got to a safe location, there were two to three other uniformed troopers there. At no time did any of the troopers unholster their weapons.  David asked defendant to get out of the vehicle, which he did slowly, and then asked defendant to walk to the front of the vehicle. David then asked defendant to engage in three field sobriety tests. He gave defendant the option to perform or not perform the tests. Defendant agreed to perform the tests.

¶ 9　　After defendant completed the field sobriety tests, David asked defendant how long had it been since he had something to drink because defendant initially denied that he had consumed any alcohol. Defendant replied that he had been drinking earlier. David did not give defendant

*Miranda* warnings at any time.

¶ 10    David's dashboard video was played in open court.  The video showed the citizen who made the call talking to David and defendant throwing up out onto the ground. The video also showed David approaching defendant and asking defendant for his car keys and identification. The video showed the nonstop traffic at the construction site that at times made it difficult to hear David on the video.   David acknowledged that there were troopers on the driver's side as well as the passenger side of the vehicle. David noted that the video showed him asking for defendant's cellphone which defendant gave to him.

¶ 11    While David patted defendant down, the IDOT driver was preparing defendant's vehicle to be put it on the flatbed to relocate to the secondary location. David noted that when defendant was in the backseat of the squad car, he was not in handcuffs, but the doors were locked. After defendant completed the three field sobriety tests, David asked defendant additional questions. The video showed David talking to defendant a few feet away while defendant was standing on the sidewalk unhandcuffed.

¶ 12    Defense counsel moved to suppress the statement defendant made at the initial stop on the Dan Ryan that he was driving north when in actuality he was driving south, the results of the field sobriety test, and the statements made to David after the field sobriety tests were completed. At arguments on the motion to suppress, defense counsel asserted that defendant was under arrest for purposes of *Miranda* when his car keys were taken from him at the initial traffic stop on the Dan Ryan expressway.  Defense counsel argued the traffic stop was elevated to a custodial arrest because there were several troopers at the traffic stop, defendant was patted down after he was asked to exit the truck and driven to an undisclosed secondary location.

¶ 13    The State argued the traffic stop was a temporary detention that did not require *Miranda* warnings. The State urged that the trooper's actions were inconsistent with an arrest until after the field sobriety tests were concluded and noted that David clearly informed defendant that he needed to further his investigation to determine if defendant was safe to drive in a location that was unsafe due to the heavy traffic on the expressway. It was not until after defendant completed the field sobriety tests that David determined that defendant was driving under the influence of alcohol and placed him in custody.

¶ 14    The court denied defendant's motion finding David approached defendant's car stopped on the side of the highway as part of a traffic stop due to the information from the concerned citizen and his own observations. The court found at the time David asked defendant the first set of questions at the side of the highway, defendant was detained but not under arrest and was not handcuffed.  The court noted that the video showed that the impairment tests could not have been done safely on the side of the road due to the heavy traffic, including trucks, that were passing right next to the area where defendant would have been walking. The court found the trooper moved defendant to a safer area a half mile away to conduct the field sobriety tests, at which point he was still detained but not under arrest when he took the field sobriety tests.  The trial court found that the officer testified credibly, and his actions were very reasonable. The court further found that based on the evidence at the motion to suppress, defendant was not under arrest until the field sobriety tests were completed, which was completely proper, and defendant was never in custody pursuant to *Miranda* at any point.

¶ 15    At trial, David testified that he was working alone on August 26, 2017, in a marked car, when he was dispatched to a call on the north end of the Dan Ryan expressway near Roosevelt Road. When he got to that area, he noticed the traffic was heavy and moving slowly and the left

lane was closed off with barricades due to construction. When he turned from the center of the expressway into the southbound lanes, he observed a pickup truck in the left center lane that was not moving. There were five total traffic lanes and two shoulders with the furthest left lane closed to construction, leaving four southbound moving traffic lanes. The pickup truck was stopped in one of the open left lanes disturbing the flow of traffic. Vehicles were changing lanes to the right and right center lanes to go around the truck.

¶ 16    David drove through the accident investigation site in the center of the expressway to enter the southbound lanes which put the truck directly in front of him. He could see there was one occupant in the vehicle who was leaning over the steering wheel. David used his air horn and emergency siren to get the attention of the driver. The driver picked his head up and began to travel southbound changing lanes three times to the furthest right lane without signaling any of the lane changes. David pulled behind the vehicle as it entered the right shoulder and followed it until it came to a stop. He then activated the emergency lights on the top of his vehicle and this activated his dashcam. The dashcam operates the entire time the vehicle is running and will record the event along with the 6 to 90 seconds before its activation onto a DVD. In this case, the audio portion of the dashcam started to record when Trooper David initially approached defendant's vehicle on the right shoulder of the expressway.

¶ 17    Defendant exited the truck and began to walk on the shoulder towards David's squad car. David had not instructed defendant to exit his car. Defendant then walked back to his vehicle and drove on the shoulder back into traffic. David used the emergency sirens to curb defendant's vehicle on the shoulder and had him immediately stop.

¶ 18    After defendant stopped a second time, David exited his squad car and approached the truck on the driver's side. Defendant was seated in the driver's seat and was the only person in

the car. David was standing right outside the driver's door, approximately two to three feet from defendant, identified himself as an Illinois State Police trooper and asked for his license and insurance. David could see that defendant's eyes were bloodshot, glassy and reddish in color. He smelled a strong odor of alcohol on defendant and defendant's speech was slurred and thick tongued throughout their entire interaction.

¶ 19    During this initial conversation with defendant, a black Dodge Charger pulled onto the right shoulder in front of them. A person exited their vehicle and began running on the shoulder towards David. David left defendant's vehicle and went to talk to this person. He spoke to this person for approximately a minute and a half.

¶ 20    David then returned to defendant's vehicle and found defendant's driver side door was now open although defendant had not been instructed to open the door. The dashcam video was then played for the jury. David testified that that when he first saw defendant's truck it was behind him and not visible on the video. The video showed defendant's vehicle crossing the lanes of traffic and stopping in front of an unknown motorist on the shoulder. The video showed defendant driving southbound on the shoulder towards the traffic lane while David eases him over to curb him on the right shoulder. David pointed out the initial time he spoke to defendant at his vehicle and made his initial observations that defendant had bloodshot and glassy eyes, a strong odor of alcoholic beverage on his breath and on his person and slurred speech. He also indicated the portion of the video where he approached the civilian that was walking on the shoulder towards him. He was away from defendant's car at this time but the dashcam was still recording defendant in his truck. He later reviewed this portion of the video and observed that the front driver's door had opened, and defendant leaned out into the shoulder area.

¶ 21     After David spoke to the civilian, he came back to defendant's truck and had another conversation with defendant. He was now standing inside the open driver's door.  David testified he observed fresh vomit on the driver's floorboard, down the side of the vehicle and partially on the ground. David noticed defendant continued to have a strong odor of alcohol coming from his breath and on his person and he observed vomit on defendant and on defendant's vehicle. He further noticed that defendant's eyes were still bloodshot and glassy, and he had trouble speaking at times with slurred speech.

¶ 22     David asked defendant for his license and insurance. Defendant produced his license but was unable to locate proof of insurance. Sergeant Farnesi arrived on the scene to assist. David then described all of this on the video.

¶ 23     After noticing the vomit, David asked defendant if he needed medical attention. Defendant told him that the vomit was not his and stated that it was "his girls." There were not any other occupants in the truck with defendant. David asked defendant where his girlfriend was, and defendant stated that she was at his house and he had left her somewhere.  As defendant was speaking to him, David noticed that defendant was very focused on his phone. Defendant's responses to his questions were very slow and he was very focused on trying to find his insurance card.

¶ 24     David continued to speak with defendant with Sergeant Farnesi present. He asked defendant where he was going, and defendant told him that he was going home to Marine Drive. He then asked defendant in what direction he was traveling, and defendant responded that he was traveling north. Defendant was actually traveling south and in the wrong direction from Marine Drive. Trooper David asked defendant where he had been coming from and defendant did not answer him. David then asked defendant to exit the vehicle because based on the observations he

made of defendant, including that the was vomiting on the side of the road, he believed defendant's sobriety was in question and he wanted to offer him the standardized field sobriety test. However, defendant did not initially comply with his repeated requests to exit the vehicle and continued to look through his cell phone. Defendant eventually exited the truck and walked towards the squad car with David.

¶ 25    As they walked to the squad car, Trooper David asked defendant if he had had anything to drink that night and defendant stated that he did not. David patted him down to check for weapons before placing him in the rear seat of his squad car. The Illinois Department of Transportation arrived and relocated defendant's vehicle to the next exit and David went to the same location.

¶ 26    Once he relocated to the bottom of the 18th Street ramp with defendant, he asked defendant if would take the three standardized field sobriety tests. Defendant agreed. While speaking with defendant about the tests, David was about two feet away from defendant and David observed that defendant continued to have a strong odor of alcohol on his breath and could see that his eyes are bloodshot, glassy and red and his speech was slurred and "thick-tongued" at times. There was noticeable vomit on the lower parts of his pants.

¶ 27    David began by administering the Horizontal Gaze Nystagmus Test known as the HGN. In this test, the subject follows a blue light as it is approximately 12 to 18 inches in front of his face at a slow pace and the officer looks for different clues in the subject's eyes of nystagmus, or an involuntary jerking of the eye. During the first section of the test, defendant had visible flooding of his eyes as his eyes went back to both the left and the right indicating a lack of smooth pursuit. For the second part of the test, David moved the light out to a fixed point to his left and again to his right. As he held the light out, both of defendant's eyes repeatedly fluttered

in both directions. As for the third part of the test, defendant began to follow the light as he moved it slowly from the center to the left and to the right. David watched defendant's eyes as defendant watched the light and observed them fluttering before the light reached the fixed point.

¶ 28    There are six possible clues that indicate consumption of alcohol in the HGN test and David observed all six possible clues in defendant. The video of the HGN test was played for the jury. David noted that he had to repeatedly ask defendant to keep his head still during the test so he could properly perform the test.

¶ 29    The walk-and-turn test was administered next. The first section is an instructional phase where the subject is given a set of instructions and asked to stand in a starting position. The second portion is the test where the subject is asked to walk down and back with a specific set of instructions.

¶ 30    Trooper David asked defendant to stand with his right foot in front of his left foot touching his heel to the toe instructing him not to walk until he was told to.  He told defendant to walk nine steps in a straight line with each step touching heel to toe and at step nine to keep his front foot planted down on the ground and turn as he showed him. He instructed defendant to keep his hands at his side, not to stop walking and to count out loud as he walked nine steps forward and nine steps back. He demonstrated this for defendant by walking three steps, turning and walking three steps back. Defendant appeared to understand his demonstration and instructions.

¶ 31    During the instruction portion, defendant was unable to stand in the straight position with his right foot in front of his left foot. During the test itself, defendant counted out 15 steps forward as opposed to 9 and then turned incorrectly by picking up his foot. He used a light pole to support his turn and walked back 24 steps, counting out to 41. During the forward and return

steps, defendant visibly missed his heel to toe on all his steps. Defendant had his arms raised from his side on all of his steps. During the steps forward, defendant visibly stopped walking on step number 14. On the return steps, he visibly stopped walking on step number 10 and stepped off the line at steps number 2, 3, 10, 19 and 21.

¶ 32    There are eight different clues on the walk-and turn test, two on the instructional phase and six on the actual test itself. The test guidelines indicate two out of eight clues indicate impairment. According to David, defendant exhibited seven out of eight possible clues.

¶ 33    The video of the walk-and-turn test was played for the jury.  David pointed out where defendant reached out and grabbed the city light post for balance to turn around and where on his return, defendant's feet were almost next to each other instead of heel to toe as instructed.

¶ 34    Finally, David administered the one leg stand test. David explained this test to defendant by asking him to raise the foot of his choosing approximately six inches off the ground, keep his hands at his side while looking down at his raised foot and counting out loud by saying 1001, 1002, 1003, and so on. David observed defendant had difficulty balancing and was swaying. Defendant put his foot down three times and raised his arms from the side more than six inches. He also hopped on his planted foot to help maintain his balance. According to David, defendant exhibited all four of the four possible clues of impairment on that test. The vide of the test was played for the jury.

¶ 35    After the tests were completed, David asked defendant if there was any reason that defendant would smell like alcohol.  Defendant responded that one of his friends had spilled alcohol on him. David again asked where defendant's girlfriend was, and defendant answered that she was at home and on her way to his house. David asked defendant if he had been drinking earlier.  Defendant responded that he had been drinking earlier.  When David questioned him

about it, defendant stated that it was around 1:00 a.m. During this conversation, David observed that defendant continued to have a strong odor of alcohol on his person, and bloodshot, glassy eyes and slurred speech. David then placed defendant under arrest for driving under the influence of alcohol.

¶ 36 David drove defendant to the station for processing. David noted that as defendant sat in the rear compartment of his squad car, the entire vehicle smelled like alcohol. At the station, David read defendant the warnings to motorist from a preprinted form, as required when arresting a person for driving under the influence. Defendant refused to take the breathalyzer test. David testified that in his professional capacity as an Illinois State Police trooper, he has been the primary officer on almost 1400 incidents where he had an opportunity to observe individuals who he knew to be under the influence of alcohol and assisted on an additional 600 or 700 incidents. He personally had the opportunity to observe individuals who he knew to be under the influence of alcohol hundreds of times. In his opinion, defendant was under the influence of alcohol and that he was unsafe to continue driving that night. That opinion was based upon his training and experience with people under the influence and the observations that he made of defendant's person, his vomiting on the side of the road, the constant odor of alcohol on his breath, his bloodshot, glassy eyes, the characterization of his speech throughout his entire interaction and his difficulty following instructions. In addition, defendant scored six out of six indicating consumption of alcohol on the HGN test, he later admitted to drinking, and there were multiple clues of impairment in the other two tests along with his difficulty in maintaining his balance.

¶ 37 The State rested. The defense rested without presenting evidence. The jury returned a verdict of guilty. Defendant's motion for a new trial was denied. Defendant was sentenced to

three years' imprisonment.

¶ 38                                    ANALYSIS

¶ 39    Defendant argues in the first heading of his brief that the trial court erred in denying his motion to suppress statements where defendant should have received *Miranda* warnings *before* being asked to perform the field sobriety tests.  Later in the same paragraph, and throughout the remainder of his brief, defendant argues that the trial court erred when it failed to suppress the statements he made *after* he completed and failed the field sobriety tests.  Defendant has not adequately addressed his claim that he should have received *Miranda* warnings *before* being asked to perform the tests, so he has abandoned this claim.  We therefore address defendant's argument that the trial court erred when it failed to suppress the statements he made *after* he completed and failed the field sobriety tests.

¶ 40    We note that, in addition to defendant's failure to clearly identify the issue he wished to raise in this court, defendant has also failed to identify the specific statements he sought to suppress in the trial court, and he has failed to identify any particular statements in his brief before this court.   Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires a party to support their arguments on appeal with specific facts and citation to relevant authority. See also *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 7 (the purpose of our supreme court's rules is to require the presentation of clear and orderly arguments so that we may ascertain and dispose of the issues at hand, as this court is not a depository into which litigants may dump the burden of research). It is not the job of this court to identify the specific statements that defendant claims were improperly admitted.  Generally, a violation of Rule 341(h)(7) results in forfeiture of the issue raised.  However, we chose to address the merits of this claim.

¶ 41    In reviewing a trial court's ruling on a motion to suppress evidence, we apply a two-part standard of review. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003). We must give great deference to the trial court's factual findings and will reverse only if the findings are against the manifest weight of the evidence. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). A trial court's factual finding is against the manifest weight of the evidence only if it is unreasonable, arbitrary, or not based on the evidence presented, or if the opposite conclusion is clearly evident. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008). However, the trial court's ultimate legal conclusion as to whether suppression is warranted is subject to *de novo* review. *Gherna*, 203 Ill. 2d at 175.

¶ 42    A roadside stop and questioning of a person is more akin to the brief detention and questioning presented in *Terry v. Ohio*, 392 U.S. 1 (1968), than to an interrogation of an accused following an arrest. *Berkemer v. McCarty*, 468 U.S. 420, 422-23 (1984).  When an officer conducts a roadside stop, an officer, who lacks probable cause yet suspects that the person stopped has committed, is committing, or is about to commit a crime, may briefly detain the person in order to investigate the circumstances that provoked the officer's suspicions. *Id.* at 439-40. In this context, *Miranda* is implicated only when a "reasonable man in the suspect's position would have understood his situation" and believed that he was in custody. *Id.* at 440-42.

¶ 43    In order to determine whether an accused who is questioned at the scene of a traffic incident is detained for purposes of *Miranda,* we must first consider the circumstances surrounding the questioning. See *People v. Slater*, 228 Ill. 2d 137, 150 (2008). Several factors are relevant in this analysis including: (1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present while the accused was being questioned; (3) the presence or absence of the accused's friends or family; (4) any indicia of a formal arrest, including a show of weapons or force, physical restraint, booking, or fingerprinting; (5) how the

accused arrived at the place where the questioning occurred; and (6) the accused's age, intelligence, and mental makeup. *Id*. After examining the circumstances surrounding the questioning, we then must determine whether, in light of those circumstances, a reasonable person, who is innocent of any crime, would believe that he could terminate the questioning and leave. *Id*. After examining these factors, the question becomes what a reasonable person, innocent of any crime, would have thought had he or she been in the defendant's shoes. *People v. Braggs*, 209 Ill. 2d 489, 506 (2003).

¶ 44    After considering the foregoing factors it is clear that defendant was not in custody at the time he made the statements and therefore *Miranda* warnings were not required. *Miranda* warnings are not required prior to general on-the-scene questioning by police who are investigating the scene (*People v. Parks*, 48 Ill.2d 232 (1971), which is exactly what David was doing.

¶ 45    When first David first questioned defendant on the side of the Dan Ryan expressway, and again when David spoke with defendant on the off ramp, David's questions were brief. David was by himself and there was no allegation that David was aggressive, hostile or accusatory. David made no show of force and did not in any way indicate that defendant was under arrest. David testified that when he moved defendant to the second location, he took defendant's keys and phone because his observations and training led him to believe that it was not safe for defendant to drive. He explained to defendant what he was doing and why he was transporting defendant to a second location. David arranged for defendant's vehicle to be transported to the safter location. Defendant voluntarily went with David to the second location, riding in the back of David's police vehicle. Defendant was not handcuffed or otherwise restrained at any time. When he arrived at the second location, David asked defendant if he wished to perform the field

15

sobriety tests. Defendant agreed. After the tests concluded, defendant answered David's question regarding where his girlfriend was and the last time he had had a drink. Defendant was not handcuffed at that time. The questions were posed while David and defendant were standing on the street. Defendant stated that he was 38 years of age and there was no evidence that he suffered from any intellectual deficit or mental or emotional problems, outside of his alcohol consumption, that would have affected his perception of whether he was free to not answer the question. Defendant appeared to understand what the officer was asking him and responded appropriately. This was a "general on-the-scene investigation" which did not require *Miranda* warnings. See *People v. Havlin*, 409 Ill. App. 3d 427, 435 (2011) ("*Miranda* warnings are not required where the police conduct a general on-the-scene investigation as to the facts surrounding a crime or other general questioning.") Based on these factors, a reasonable person, who was innocent of any crime, would have believed that he could terminate the encounter and leave. Accordingly, the trial court's ruling denying defendant's motion to suppress his statement was not against the manifest weight of the evidence.

¶ 46     *People v. Wright*, 2011 IL App (4th) 100047, ¶7, which is factually similar, supports our conclusion. In *Wright*, the arresting officer saw the defendant, who he knew to have revoked driving privileges, driving. The officer followed the defendant, lost him, and soon thereafter saw the defendant in the passenger seat of another car. *Id.* The officer followed this second car and saw the defendant exit that car and walk into a nearby house. *Id.* ¶ 8. The officer went to that house, and while the officer spoke with the homeowner, the defendant exited the house. *Id.* Defendant told the officer that he had driven to a nearby grocery store, and the officer smelled alcohol on the defendant's breath. *Id.* The officer asked the defendant if he had been drinking. The defendant admitted that he had been drinking. Defendant voluntarily accompanied the

officer to the store where the defendant's car was parked. *Id.* ¶¶ 8-9. Prior to this, the defendant was not given any *Miranda* warnings. *Id.* ¶ 10. The defendant, who was not handcuffed, sat in the backseat of the squad with the windows rolled down. *Id.* ¶ 9. After locating the defendant's vehicle at the store, the officer administered some field sobriety tests, which the defendant failed. *Id.* ¶ 10. The officer arrested defendant for driving under the influence. *Id.* ¶ 15. The defendant moved to suppress the statements he made after being placed in the backseat of the squad, and the trial court denied that motion. *Id.* ¶¶ 5, 11.

¶ 47    On appeal, we found that the defendant was not in custody for *Miranda* purposes when he was placed in the backseat of the officer's squad car. *Id.* ¶ 31. We considered whether the defendant was detained for purposes of *Miranda* at any point between the initial stop and the arrest at the grocery store and  found that the defendant was not, noting  the defendant voluntarily exited the house he had gone into, he admitted to the officer that he had been drinking, and these admissions, though made in response to the officer's question, were "made absent any interrogation or custody." *Id.* ¶ 39. We then observed that the defendant voluntarily left with the officer in the officer's squad, knowing he was being transported to his vehicle, which was parked a short distance away. *Id.*

¶ 48    Similar to *Wright*, in this case defendant was not detained for purposes of *Miranda* at any point between the initial encounter on the Dan Ryan expressway and the completion of the field sobriety tests at the second location.  Defendant voluntarily went with Trooper David to the second location, agreed to complete the field sobriety tests and admitted to the Trooper David that he had been drinking.  These admissions made in response to Trooper David's question and were made absent any custodial interrogation.  See also *Berkemer,* 468 U.S. at 422-23.

¶ 49 Even if the statements should have been suppressed, any error was harmless beyond a reasonable doubt. The improper admission of a defendant's statements to the police is subject to a harmless-error analysis (*People v. Mitchell*, 152 Ill. 2d 274, 328 (1992)), unless the statements are alleged to have been physically coerced. *People v. Wrice*, 2012 IL 111860, ¶ 71. In determining whether a constitutional error is harmless, the critical question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict. *People v. Patterson*, 217 Ill. 2d 407, 428 (2005). There are three different approaches to answering this critical question: (1) analyzing the other evidence from the case to determine if that evidence overwhelmingly supported the defendant's conviction, (2) focusing on whether the error contributed to the verdict, and (3) determining whether the improperly admitted evidence was merely cumulative to the other evidence properly admitted at trial. *Id.*

¶ 50 Under any approach, it is clear that the other evidence in this case overwhelmingly supported defendant's conviction. Trooper David's testimony, in addition to the video evidence, unquestionably supports the jury's finding that defendant was driving under the influence. Defendant has not specified what utterance he made after the completion of the field sobriety tests should have been suppressed, however, we find, based on the totality of the other evidence admitted, any error in admitting statements defendant made after the field sobriety tests was harmless beyond a reasonable doubt.

¶ 51 Defendant next argues that the trial court erred by allowing David to testify as to his opinion based on his observations that defendant was under the influence of alcohol. Defendant claims that this was improper opinion testimony under Illinois Rules of Evidence 701 or 702. Ill. R. Evid. 701, 702 (eff. Jan. 1, 2011).

¶ 52 The State argues defendant has forfeited this argument because he failed to raise this specific objection in the trial court and in his motion for a new trial. At trial, when Trooper David was asked if he was able to form an opinion whether defendant was under the influence of alcohol, defendant objected on the grounds that the question called for a conclusion that the jury should determine. The trial court noted that while it was true that the question called for a conclusion, the trooper could answer and overruled the objection. Likewise, in his motion for a new trial defendant argued that, "The question as to whether defendant was under the influence of alcohol was a question of fact to be answered by the jury, not a witness." In the trial court, defendant never argued that Trooper David's opinion did not qualify as proper lay opinion testimony.

¶ 53 We agree with the State. On review, a defendant cannot change or add to the basis of his objection in the appellate court. *People v. McClendon*, 197 Ill. App. 3d 472, 482 (1990). A specific objection at trial eliminates all grounds not specified. *Id*. We also find that defendant failed to raise plain error on appeal, and therefore he has also forfeited the review for plain error. *People v. Hillier*, 237 Ill.2d 539, 545–46 (2010). Further, under Illinois Supreme Court Rule 341(h)(7) (eff. Feb. 6, 2013), points that are not argued in the opening brief are waived and shall not be raised in defendant's reply brief. In this case, defendant not only failed to raise an objection to the admission of Trooper David's opinion testimony as an improper lay opinion under Illinois Rules of Evidence at trial and in his posttrial motion he also has not raised an issue of plain error in his brief or reply brief. Thus, he has forfeited review of this issue.

¶ 54                                    CONCLUSION

¶ 55 Considering the foregoing, we affirm the judgment of the circuit court.

¶ 56 Affirmed.

¶ 57    PRESIDING JUSTICE WALKER, specially concurring joined by JUSTICE HYMAN.

¶ 58        I concur with the result. I write to clarify the point at which Miranda warnings should be given. Here, Officer David had taken Vose's car keys and cell phone, and he drove Vose to another location to perform field sobriety tests which Vose failed. By the time Vose failed the sobriety tests, Vose and "any reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Slater*, 228 Ill. 2d at 150.

¶ 59        Given the circumstances surrounding the continued interrogation and the failed field sobriety tests, Vose knew that David would not simply give him a ticket and allow him to leave.  A reasonable person in Vose's position, with no keys and no cell phone, would have recognized that he was not free to leave, and was therefore, in custody. See *Braggs*, 209 Ill. 2d at 506.

¶ 60        At the very latest, upon completion of the sobriety tests, "[t]he temporary detention of an ordinary traffic stop [had] evolve[d] into a custodial situation, requiring *Miranda* warnings prior to the interrogation." *People v. Tayborn*, 2016 IL App (3d) 130594, ¶ 20.  Because Officer David did not comply with his duty to remind Vose of his constitutional rights, the trial court should have suppressed the statements Vose made after he failed the sobriety tests. *Tayborn*, 2016 IL App (3d) 130594, ¶ 20. Under the circumstances of this case, Miranda warnings should have been given at the conclusion of the failed field sobriety tests.

¶ 61        However, I concur in affirming the conviction because the evidence overwhelmingly shows Vose's guilt.  The video corroborating Officer David's testimony makes this one of the rare cases in which the erroneous admission into evidence of a confession constitutes harmless error. See *People v. St. Pierre*, 122 Ill. 2d 95, 114 (1988); *Mitchell*, 152 Ill. 2d at 328.

¶ 62        Justice Hyman joins in this special concurrence.